**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | | |
|---|---|---|
| CORR WIRELESS COMMUNICATIONS, L.L.C., CELLULAR SOUTH, INC., AND CELLULAR SOUTH LICENSES, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:12-cv-00036-SA-SAA |
| AT&T, INC., AT&T MOBILITY LLC, MOTOROLA SOLUTIONS, INC., AND QUALCOMM INCORPORATED, | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT AT&T'S OPPOSITION TO PLAINTIFFS'**
**MOTION FOR EXPEDITION**

Defendants AT&T Mobility LLC and AT&T Inc.[1] (collectively, "AT&T") hereby

oppose the Motion for Expedited Scheduling and Case Management Conference and for Other

Relief (Doc. No. 10) filed April 12, 2012, by Plaintiffs Corr Wireless Communications, L.L.C.,

Cellular South, Inc., and Cellular South Licenses, LLC (collectively, "Cellular South").

**SUMMARY**

Cellular South's request for expedition should be denied because Cellular South provides

no justification for imposing the extraordinary burdens of expedition on Defendants or this

Court. The matters that Cellular South seeks to raise in this Court are – pursuant to a request for

rulemaking that Cellular South and its allies filed in 2009 – currently before the Federal

Communications Commission ("FCC"), which has both the authority and technical expertise to

address the factual matters underlying Cellular South's claims. Indeed, the detailed injunctive

---

[1] By joining this opposition, AT&T Inc. does not concede that this Court has personal jurisdiction over it or that AT&T Inc. is a proper party to this suit. AT&T Inc. does not waive and specifically reserves the right to raise these issues in response to Plaintiffs' complaint.

relief that Cellular South seeks from the Court in an expedited proceeding parallels almost exactly the regulatory issues that the FCC has undertaken to decide in a notice of proposed rulemaking released just days before Cellular Southfiled its complaint. *Compare* Compl. for Injunctive Relief and Damages ¶ 431 (filed Apr. 2, 2012) (Doc. No. 1) ("Compl."), *with Interoperability NPRM* [2] ¶ 21. Cellular South's suit improperly seeks to circumvent the FCC's statutory authority to regulate wireless telecommunications and to establish operational standards for wireless spectrum in particular.

Cellular South's effort to minimize the burden on the parties of its compressed schedule also ignores the technical complexity of the underlying facts and the significance of the investigation required if its Sherman Act claims are allowed to proceed. To be sure, some of the technological issues implicated by the complaint are currently before the FCC, but that rulemaking involves a forward-looking inquiry and does not involve any claim of wrongdoing against any party – or the complicated market-definition and market-power issues implicated by any Sherman Act claim – much less an investigation of accusations concerning the subjective intentions of individual participants in standard-setting activities. There are dozens of potential party and third-party witnesses to the events and transactions alleged in the complaint. The task of fully investigating Plaintiffs' allegations; mastering and rendering understandable technological issues; preparing expert witnesses on both technical and economic matters; and preparing a full defense will require substantial time and resources. Expediting the schedule in the manner proposed by Cellular South would unfairly threaten Defendants' ability to defend against the Sherman Act claims.

---

[2] *See* Notice of Proposed Rulemaking, *Promoting Interoperability in the 700 MHz Commercial Spectrum*, WT Docket No. 12-69, FCC 12-31 (rel. Mar. 21, 2012) ("*Interoperability NPRM*").

AT&T will, in accordance with the schedule set by the magistrate, file a motion to dismiss explaining why Cellular South's allegations fail to state any claim under the antitrust laws and why, in any event, those claims should be dismissed pending FCC action on its pending rulemaking. In the meantime, the Court should deny Cellular South's motion and allow this case to move forward under this Court's ordinary procedures governing a case of this complexity.

## ARGUMENT

## PLAINTIFFS' REQUEST FOR EXPEDITED TREATMENT IS UNJUSTIFIED

A.  **Plaintiffs Chose To Pursue Relief Before the FCC, Which Has Initiated a Rulemaking; It Is Inappropriate To Seek To Leapfrog the Proceeding in Plaintiffs' Chosen Forum**

Cellular South's request for expedition ignores the context in which its complaint was filed – namely, the existence of a regulatory proceeding that Cellular South initiated and in which it seeks the same relief it seeks here.

1.  Cellular South's claims revolve around the development of industry standards governing wireless spectrum used by providers of commercial wireless services. *See* Compl. ¶ 10. In the United States, the allocation of wireless spectrum is generally within the statutory authority of the FCC, subject to specific congressional mandates.[3] The spectrum at issue in the complaint is in the 700 MHz spectrum band. Until the past decade, this spectrum was occupied by analog television broadcasters in TV Channels 52-69.[4] Starting in the 1990s, the FCC, in a long series of orders, directed that the 108 MHz of spectrum between 698 MHz and 806 MHz be

---

[3] Wireless spectrum is dedicated to a variety of uses, including radio and television broadcasting, satellite transmissions, government and public safety communications, navigation, and many others in addition to commercial mobile services. *See generally* U.S. Department of Commerce, National Telecommunications and Information Administration, Office of Spectrum Management, *United States Frequency Allocations*, http://www.ntia.doc.gov/files/ntia/ publications/2003-allochrt.pdf.

[4] *See* Second Report and Order, *Service Rules for the 698-746, 747-762 and 777-792 MHz Band*, 22 FCC Rcd 15289, ¶ 16 (2007) ("*700 MHz Second Report and Order*").

3

"cleared" of analog broadcasters; divided the spectrum into blocks by frequency and geography; designated particular spectrum blocks for either commercial or public safety uses; arranged auctions for the various spectrum blocks; and established "service rules" – that is, technical and regulatory requirements – for the various blocks.[5]  The commercial licenses for the 700 MHz band were assigned through several auction proceedings.  The focus of the complaint is on three blocks of spectrum in the Lower 700 MHz band – that is, the 698-746 MHz band – known as the A, B, and C Blocks.  The Lower C Block was auctioned in 2002; the Lower A and Lower B Blocks were auctioned in 2008.[6]

Before auctioning spectrum for commercial mobile services, the FCC establishes the general parameters to govern the use of the spectrum – for example, it may limit the power of transmissions to avoid harmful interference.  In addition, the FCC commonly imposes certain obligations on potential licensees, including build-out and service requirements to ensure that spectrum is actually used to provide service to consumers.  At the same time, the FCC generally leaves it to private industry to determine what commercial services to provide and what technical standards to employ.  For example, the FCC has had no role in the development of fourth-generation ("4G") Long Term Evolution ("LTE") service, the type of service at issue in Cellular South's complaint.  Instead, LTE standards were developed by the 3rd Generation Partnership Project ("3GPP"), "a consensus-driven international partnership of industry-based telecommunications standards bodies" with no government affiliation.[7]  *See generally Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008) (rejecting antitrust challenge to 3GPP standard-setting).

---

[5] This background is summarized in paragraphs 14-41 of the *700 MHz Second Report and Order*.

[6] *See Interoperability NPRM* ¶ 8.

[7] *Interoperability NPRM* ¶ 10.

As the FCC has noted, "as the mobile wireless services industry has transitioned from one centered on interconnected mobile voice communications to one that produces an array of voice, messaging, and broadband services, the number of related mobile wireless industry segments involved in bringing these information products to mobile consumers has grown and evolved."[8] The various "interrelated market segments form the mobile wireless ecosystem, the various parts of the supply and production network that bring thousands of mobile wireless products to Americans every day."[9] To ensure that the various segments of this "ecosystem" can work together, development of industry standards is critical. *See Golden Bridge*, 547 F.3d at 273. One aspect of this standard-setting is development of standards applicable to LTE service on particular spectrum bands: devices are designed to work with particular frequencies, and the characteristics of particular frequencies, along with any applicable regulatory restrictions, will constrain manufacturers' ability to develop equipment that will work on those frequencies. Moreover, as with any technology, the development of standards involves inevitable trade-offs: for example, a device that works on more frequencies – and that may therefore be able to take advantage of a broader range of potential networks – may be bulkier or use more power than a device that is more narrowly tailored to a particular frequency. Furthermore, overcoming the technical hurdles associated with a broader range of frequencies may delay development, denying consumers the benefits of innovation and slowing investment.[10]

3GPP has developed technical standards for the Lower A, B, and C Blocks of the 700 MHz spectrum, known as "Band Class 12"; it also has developed standards applicable to "Band

---

[8] Fifteenth Report, *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless, Including Commercial Mobile Services*, 26 FCC Rcd 9664, ¶ 5 (2011).

[9] *Id.*

[10] *See Interoperability NPRM* ¶ 23.

Class 17," which includes the Lower B and C Blocks only.[11] "Entities involved in the creation of Band Class 17 during 3GPP proceedings assert that it was necessary to create a separate band class . . . to avoid interference issues from [digital television] in Channel 51 and high power operations" in a separate block of spectrum – the E Block – which is also adjacent to A Block spectrum.[12] The adoption of a narrower band class was first discussed in August 2008 at a meeting of the 3GPP in Jeju Island, South Korea; there was no objection to the addition of that band.[13] Technical issues related to Band Class 17 were taken up at several subsequent meetings of 3GPP in late 2008 and early 2009; those matters were discussed without any objection to the addition of the band by Cellular South or anyone else (even though Cellular South had already purchased Lower A Block spectrum at auction by that time).[14]

2.      In late 2009, four companies that had purchased Lower 700 MHz A Block licenses – Cellular South Licenses, Inc., Cavalier Wireless, LLC, Continuum 700, LLC, and King Street Wireless, L.P. – filed a petition for rulemaking, asking the FCC to mandate that all devices operating in the 700 MHz band be capable of operating "over all frequencies in the band."[15] In response to the petition, the FCC received comments and reply comments; the FCC also, in 2011, "held a workshop on the status and availability of interoperable mobile user

---

[11] *See id.* ¶ 10.

[12] *Id.* The A, B, and C Blocks each consist of two 6 MHz blocks of paired spectrum; it is useful to have paired spectrum to avoid interference between uplink and downlink transmissions. The E Block is adjacent to the high-frequency pair in the Lower A Block.

[13] *See* Report of the 3GPP TSG RAN WG4 Meeting – August 18-23, 2008, at 15-16, *available at* http://www.3gpp.org/ftp/tsg_ran/WG4_Radio/TSGR4_48/Report/. The band was originally to be referred to as Band Class 15, but the numbering was changed to avoid confusion with a separate band class in Europe. *See id.* at 15.

[14] Documents related to the relevant working group discussions are publicly available through the 3GPP website, http://www.3GPP.org/ftp/Specs/html-info/Meetings-R4.htm.

[15] *Interoperability NPRM* ¶ 11.

equipment across commercial spectrum blocks in the 700 MHz band."[16] "Panelists discussed the technical feasibility of an interoperability condition, as well as how an interoperability requirement might affect such factors as device cost and performance, and the need for additional development and testing."[17]

Last month – about a week before Cellular South filed its complaint – the FCC issued a notice of proposed rulemaking to address the issues raised by the petition. The FCC noted disagreement over – and sought further comment and data regarding – whether an interoperability requirement "is necessary to obtain affordable, advanced mobile devices to deploy service to consumers in smaller, regional, and rural service areas."[18] The FCC also asked for comment on whether "the use of interoperable equipment [would] promote consumer choice" or whether, on the other hand, "deployment of Lower 700 MHz B and C Block service [would] be delayed by a move towards interoperability, either by rule or industry agreement."[19] The FCC asked for additional data "to support claims that an interoperability obligation would require complete redesign and upgrade of devices and base stations," and for "additional information on the necessary changes to chipsets and the timeframes these changes will impose."[20] The FCC also stated that, "[e]ven if the record demonstrates that the existence of two distinct band classes in the Lower 700 MHz band is creating a device and network deployment problem," it would still be required "ultimately [to] resolve the central question as to whether a

---

[16] *Id.* ¶ 14.

[17] *Id.* (footnotes omitted).

[18] *Id.* ¶ 21.

[19] *Id.* ¶ 24.

[20] *Id.* ¶ 25.

single band class would cause widespread harmful interference to Lower 700 MHz B and C Block licensees."[21]

     **3.**     Cellular South seeks expedited consideration of its request for injunctive relief; that relief is designed to force AT&T to discontinue its use of Band 17 devices and instead to employ Band 12 devices – that is, devices that would operate not only in Block B and Block C, but also in Block A. *See* Compl. ¶ 431. But that relief falls squarely within the scope of the relief that Cellular South has already sought from the FCC, which has – in response to a petition that Cellular South filed in 2009 – issued a notice of proposed rulemaking to consider whether, as a matter of policy and consistent with technical constraints, the FCC should mandate the use of devices in the 700 MHz spectrum band that can operate across all frequencies in that band. The pendency of that proceeding – at Cellular South's request – makes Cellular South's effort to invoke this Court's jurisdiction inappropriate. Even if Cellular South could state an antitrust claim against AT&T – and its complaint fails to do so – such a claim should not proceed when the FCC, in the exercise of its own statutory authority and expert regulatory judgment, has the very matters raised by Cellular South's complaint under active consideration. In accordance with the schedule set by Magistrate Judge Alexander, AT&T intends to file a motion to dismiss the complaint, setting out these points and supporting authorities.

     Meanwhile, that context should lead the Court to reject Cellular South's request for an expedited schedule. Cellular South cannot dispute that its concerns about the impact of 3GPP standard-setting date back at least to late 2009. It made the judgment then that its concerns were matters for the responsible regulator to consider, not matters that could justify the filing of an antitrust complaint. It allowed its request for relief to proceed at the FCC for more than two

---

[21] *Id.* ¶ 30.

years, and has now obtained the very regulatory action that it sought: the initiation of a rulemaking proceeding that will evaluate Cellular South's argument that regulation should override the results of consensus-based industry standard-setting. Having chosen its forum, Cellular South should not be heard to insist that a separate tribunal should rush to decide the very matters that are before the FCC.

> **B.** **Expedition Would Impose Unjustified Burdens on Defendants in the Absence of Any Showing of Threatened Harm**

Cellular South's effort to impose extraordinary burdens on the parties and on this Court is, in any event, unjustified by any showing of need. Cellular South's motion is based only on the unsworn assertions of its counsel that the company is threatened with irreparable harm. Cellular South does not and cannot explain why its circumstances justify modification of ordinary procedures to accommodate its preferences, when it has not sought and could not justify preliminary injunctive relief; when it has waited for years to begin a federal court case to pursue claims based on facts of which it has been aware throughout that period; and when a proceeding is already underway before the FCC to address the industry standards that are of alleged concern. Plaintiffs admit that they currently have avenues for development of a 4G LTE network. *See* Mot. at 2. But even if some part of Cellular South's business is threatened – and it has provided no evidence that it is – it is entirely because of Cellular South's deliberate strategy.

Cellular South also suggests that expedition will impose few burdens on Defendants, but that is not true. Unlike the FCC proceeding – which is focused on technical and regulatory policy issues that have nothing to do with any purported wrongdoing – a claim under the Sherman Act would require investigation of historical facts concerning the conduct of the parties and many non-parties (some already named in the complaint); development of facts concerning transactions (for example, contracts and discussions with equipment vendors) that are outside of

the matters at issue before the FCC; and investigation of economic issues and preparation of expert economic analysis on market-definition and market-power issues. And, of course, the FCC proceeding will not involve any document discovery or document production. Just to take one example, facts regarding actions taken at 3GPP will be critical to this case; tracking down witnesses and documents and reconstructing events from 2008 will be expensive and time-consuming. And, given the complexity of the industry and the nature of the allegations, finding and retaining experts and developing expert testimony will be an extended (and expensive) task.

The complexity of this case is foretold by Plaintiffs' request for a four-week trial. The accompanying suggestion that discovery be completed in approximately six months is unrealistic both from the standpoint of the complex factual and legal issues involved and from a practical standpoint, given the number of parties and lawyers involved.

## CONCLUSION

For the foregoing reasons, Cellular South's request for an expedited schedule should be denied.[22]

Respectfully submitted,
AT&T MOBILITY LLC and AT&T, Inc.

/s/David W. Upchurch
DAVID W. UPCHURCH, MSB #10558
HOLLAND, RAY, UPCHURCH & HILLEN, P.A.
P.O. DRAWER 409
TUPELO, MS 38802-0409
TELEPHONE: 662-842-1721
FACSMILE: 662-844-613
dwu@hruhpa.com

---

[22] The Court should also deny Cellular South's premature request to appoint a Special Master, which is unsupported by any showing that a magistrate judge would be unable to address any matters duly assigned by the Court.

OF COUNSEL

Michael Kellogg (Pro Hac Vice pending)
Aaron Panner (Pro Hac Vice pending)
Kellogg, Huber, Hansen, Todd, Evans & Figer, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, DC  20036
Telephone:  (202) 326-7921
mkellogg@khhte.com
apanner@khhte.com


## CERTIFICATE OF SERVICE


    I, David W. Upchurch, hereby certify that I have this day filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following registered participants:

        Alan W. Perry, Esq., MSB #4127
        Daniel J. Mulholland, Esq., #3643
        Walter H. Boone, Esq., #8651
        Forman, Perry, Watkins, Krutz & Tardy, LLP
        200 S. Lamar Street, Suite 100
        Jackson, MS  39201-4099
        Tel: 601-969-7833
        Fax: 601-960-8613
        aperry@fpwk.com

        Charles L. McBride, Esq., MSB #8995
        M. Patrick McDowell, Esq., MSB #9746
        Joseph A. Sclafani, Esq., MSB #99670
        Brian C. Kimball, Esq., MSB #100787
        Brunini, Grantham, Grower & Hewes, PLLC
        190 E. Capitol Street, Suite 100
        Jackson, MS  39201-2151
        Tel:  601-960-6891
        Fax: 601-960-6902
        cmcbride@brunini.com

Walter T. Johnson, Esq., MSB #8712
Watkins & Eager PLLC
400 East Capitol Street, Suite 300 (39201)
P.O. Box 650
Jackson, MS  39205
Tel:  601-965-1900
Fax:  601-965-1901
wjohnson@watkineager.com

*Counsel for Plaintiffs Cellular South, Inc.*
*Corr Wireless Communications, LLC and*
*CellularSouth Licenses, LLC*

L.F.Sams, Jr.
Otis R. Tims
Margaret Sams Gratz
Mitchell, McNutt & Sams, P.A.
P.O. Box 7120
Tupelo, MS  38802-7120
ssams@mitchellmcnutt.com
otims@mitchellmcnutt.com

*Counsel for Defendant Qualcomm Inc.*

Jim M. Greenlee, Esq.
Holcomb, Dunbar, Watts, Best, Masters & Golmon
400 South Lamar Blvd., Suite A
P.O. Drawer 707
Oxford, MS  39655
jgreenlee@holcombdunbar.com

*Counsel for Defendant Motorola Solutions, Inc.*

And I have forwarded, via U.S. Mail, postage prepaid, the foregoing document to:

Roger G. Brooks, Esq.
Yonatan Even, Esq.
Cravath, Swaine & Moore, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019

John S. Gibson, Esq.
Chahira Solh, Esq.
Crowell & Moring, LLP
3 Park Plaza, 20th Floor
Irvine, CA  92614-8505

DATED this the 30th day of April, 2012.


  /s/David W. Upchurch
DAVID W. UPCHURCH