UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

CORR WIRELESS
COMMUNICATIONS, L.L.C.,
CELLULAR SOUTH, INC., and
CELLULAR SOUTH LICENSES, LLC                    PLAINTIFFS

     v.                                              CIVIL ACTION NO. 3:12CV036- SA

AT&T, INC., AT&T MOBILITY LLC,
MOTOROLA SOLUTIONS, INC.,
MOTOROLA MOBILITY, INC.,
QUALCOMM INCORPORATED, and
JOHN DOES 1-10                                   DEFENDANTS

<u>MEMORANDUM OPINION</u>

Before the Court are numerous motions filed by the party Defendants to the lawsuit, AT&T, Inc., AT&T Mobility, LLC, Motorola Solutions, Inc., Motorola Mobility, Inc., and Qualcomm Incorporated, brought by Plaintiffs, Corr Wireless Communications, LLC, Cellular South, Inc., and Cellular South Licenses, LLC, for violations of federal antitrust laws.[1]  Plaintiffs' 146-page complaint revolves around the development of standards governing wireless spectrum utilized by providers of commercial wireless services.  On April 12, 2012—ten days after Plaintiffs filed their complaint—Plaintiffs filed a Motion to Expedite Scheduling and Case Management Conference and for Other Relief [10].  After considering the arguments made by all parties on the motion to expedite, the Court deferred ruling on the motion until the Defendants had an opportunity to file motions to dismiss,

---

[1] For clarification, the Court notes that the Plaintiffs to this lawsuit are referred to collectively as either "Plaintiffs" or "Cellular South" throughout this memorandum opinion.

specifically motions to dismiss under Federal Rule 12(b)(6). All parties agreed on a scheduling order for such motions, and the Court accepted the same.

The motions now currently pending and ripe for judicial review are as follows: (1) a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2) [61] filed by AT&T, Inc.; (2) Motion to Dismiss for Failure to State a Claim or, in the alternative, Pursuant to the Doctrine of Primary Jurisdiction by AT&T Mobility LLC [65]; (3) a Motion to Dismiss for Failure to State a Claim or, in the alternative, Pursuant to the Doctrine of Primary Jurisdiction [67] by Qualcomm Incorporated; (4) Motion Request for Judicial Notice [69] filed by Qualcomm Incorporated; (5) Motion to Dismiss for Failure to State a Claim [70] filed by Motorola Solutions, Inc.; and (6) Supplemental Motion for Request for Judicial Notice [90] filed by Qualcomm Incorporated. On July 17, 2012, the Court entertained oral arguments on all of the aforementioned motions.

After marshaling through the motion-to-dismiss record, carefully considering the arguments articulated in the hearing, and reviewing the pertinent authority,[2] the Court finds that Plaintiffs' complaint fails to state a claim and, for this reason, Defendants' motions brought pursuant to Rule 12(b)(6) shall be granted. As the Supreme Court explained in Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects Rule 8(a)(2)'s threshold requirement that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to relief.'" Here,

---

[2] The Court notes that it has reviewed the case law supplemented by Plaintiffs on August 22, 2012 [98].

Plaintiffs have simply "not nudged their claims across the line from conceivable to plausible[; thus], their complaint must be dismissed." Id.

*Relevant Background Facts*

**Spectrum**

The antitrust allegations in this case concern electromagnetic spectrum, which at a basic level, essentially refers to wireless capacity. Since the mid-1990s, the Federal Communications Commission ("FCC") has conducted auctions of licenses for such electromagnetic spectrum. That is, the FCC makes available, through auctions and a competitive bidding process, new spectrum for mobile telephony and/or broadband. The spectrum at issue in Plaintiffs' complaint is the 700 MHz band, which is comprised of 70 megahertz of commercial, non-guard band spectrum, 4 megahertz of guard band spectrum, 24 megahertz of public safety spectrum, and 10 megahertz of spectrum that will be reallocated for public safety use pursuant to congressional mandate.

The FCC recently launched proceedings to "free up" the 700 MHz band for commercial mobile services, as this spectrum was once occupied by analog television broadcasters in TV channels 52-69. Commercial licenses for this spectrum were assigned through several FCC auction proceedings. The FCC auctioned licenses for the guard bands in the Upper 700 MHz band in 2000, and it initially auctioned licenses in the Lower C and D Blocks in 2002. In 2008, the FCC auctioned licenses in the Lower 700 MHz band A, B, and E Blocks, as well as the Upper 700 MHz band C Block.

***3GPP and Long-Term Evolution Wireless Broadband Technology***

The service at issue here is the fourth-generation ("4G")[3] Long-Term Evolution ("LTE") service, which Plaintiffs refer to as the "gold standard" of wireless technology. The Plaintiffs state that "[a]lthough 4G-LTE is not required to be deployed on 700 MHz spectrum, it is described in the industry as 'beachfront spectrum.'" Industry standards for such LTE wireless broadband technology to be deployed on 700 MHz spectrum are developed by a non-profit standard setting organization called Third Generation Partnership Project ("3GPP").[4] 3GPP is a consensus-driven international partnership of industry-based telecommunications standards bodies. 3GPP, established in 1998, is an industry-based group and it is not associated with any governmental agency.

As noted, the FCC held an auction to sell and repurpose licenses in the 700 MHz spectrum in 2008. The complaint filed in this action focuses on three blocks of spectrum in the Lower 700 MHz band: the A, B, and C Blocks. AT&T purchased licenses in the Lower B and C Block. Cellular South purchased spectrum in the Lower A Blocks.

In this Lower 700 MHz band, there are currently two different operating bands:

- **Band Class 12**, which covers operations in the Lower A, B, and C Blocks; and

---

[3] 4G is the successor to 3G and 2G technologies and, according to Plaintiffs, is intended eventually to supplant those standards.

[4] See Golden Bridge Technology, Inc. v. Motorola, Inc., 547 F.3d 266, 269 (5th Cir. 2008) (The 3GPP "institutes uniform technology standards for the telecommunications industry to ensure worldwide compatibility of cellular devices and systems. More than 260 companies belong to 3GPP, representing all levels of the cell phone industry. The 3GPP members are responsible for creating and developing the 3GPP standard, which means determining what technologies will be included in the standard as either mandatory or optional features.").

- **Band Class 17**, which covers operations in the Lower B and C Blocks only.

Band Class 17 was created through the 3GPP process after "Auction 73," and the creation of Band Class 17 is the focal point of Plaintiffs' claims of conspiracy, as Band Class 17 does not include the Lower A Block that was purchased by Cellular South.[5]  The entities involved in the creation of Band Class 17 during 3GPP proceedings, which include the Defendants named in this action, assert that it was necessary to create a separate band class for Lower 700 MHz B and C Block licenses in order to avoid interference issues from DTV in Channel 51 and high power operations in the E Block.  Due to the creation of this separate band class, certain Lower MHz A Block licensees, including Cellular South, filed a petition for rulemaking with the FCC in late 2009.

### FCC Petition for Rulemaking

In 2009, Cellular South Licenses, Inc., Cavalier Wireless, LLC, Continuum 700, LLC, and King Street Wireless, L.P. – all holders of Lower 700 MHz A Block licenses – filed a petition for rulemaking, asking the FCC to assure that consumers will have access to all paired 700 MHz spectrum that the FCC licenses.  The FCC was also requested to put an immediate freeze on the authorization of mobile equipment that is not capable of operation on all paired commercial 700 MHz frequencies. The Wireless Telecommunications Bureau sought comment on the petition in 2010, and the FCC received comments and reply comments.  In order to update the record and gather additional information, the Wireless Telecommunications Bureau held a workshop on the status and availability of interoperable mobile user equipment across commercial spectrum blocks in the 700 MHz band.

---

[5] Band Class 17 was originally labeled Band Class 15.

Thereafter, the FCC issued a notice of proposed rulemaking to address the issues raised by the petition for rulemaking, seeking comment, data, and evidence on the argument that an interoperability requirement in the 700 MHz band is necessary to obtain affordable, advanced mobile devices to deploy service to consumers in smaller, regional, and rural service areas. This notice of proposed rulemaking was issued in March 2012, and less than two weeks before Plaintiffs filed the instant action. All of the Defendants named in this action maintain that the FCC has "primary jurisdiction"[6] over this dispute.

### *Allegations in Plaintiffs' Complaint*

A. 3GPP Process

Plaintiffs filed their complaint on April 2, 2012, filed an amended complaint on June 8, 2012, and provide a "summary of the allegations in the complaint" in their response in opposition to the Defendants' motion to dismiss. Plaintiffs essentially contend that AT&T, Motorola, and Qualcomm maintained a conspiracy that manipulated the 3GPP standard setting process. The antitrust allegations began in 2008, shortly after "Auction 73."[7] In May of 2008, Motorola proposed that a separate band—now known as Band Class 17—be created to *include* the Lower B and C Block 700 MHz spectrum (*i.e.*, the spectrum

---

[6] The doctrine of primary jurisdiction operates, when applicable, to postpone judicial consideration of a case until an agency with special competence in the area makes a determination regarding a particular issue involved in the case. Mercury Motor Express, Inc. v. Brinke, 475 F.2d 1086, 1092-93 (5th Cir. 1973). The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." United States v. Western Pac. R.R., 352 U.S. 59, 63-64, 77 S. Ct. 161, 1 L. Ed. 2d 126 (1956); see also Wagner & Brown v. ANR Pipeline Co., 837 F.2d 199, 201 (5th Cir. 1988).

[7] As discussed *supra*, "Auction 73" happened in 2008, when the FCC licensed rights in the 700 MHz spectrum, including the Lower A, B, and C Blocks.

purchased by AT&T), yet *exclude* the Lower A Block 700 MHz spectrum licenses (*i.e.*, the spectrum purchased by Cellular South and others, including Verizon Wireless). Plaintiffs maintain that "Motorola, as a current and prospective wireless device supplier to AT&T, would have never made its proposal in the first place without the prior consent, blessing, and agreement of AT&T."

After Motorola proffered its proposal, Plaintiffs assert that, in June 2008, AT&T submitted a paper that "supported the creation of what became Band Class 17." In the report for the June 2008 meeting, Qualcomm also allegedly agreed with AT&T's conclusion on Band Class 17 with respect to "user equipment." Plaintiffs maintain that Qualcomm's support for the creation of Band Class 17 was against its own self-interest, and "can only be explained by a preceding agreement with AT&T." Plaintiffs further argue that "neither [Qualcomm or Motorola] would have taken such steps . . . without such a prior agreement [with AT&T]." Plaintiffs contend that Ericsson, a device manufacturer, raised concerns that the creation of a separate band class would "go[] against the economies of scale." Ericsson, however, subsequently withdrew its initial objection to the creation of this separate band class.

In August 2008, the 3GPP, acting by a consensus, adopted the proposal to create Band Class 17, with no dissent. Plaintiffs maintain that the 3GPP "rubber-stamped" the "concerted work" of the Defendants concerning Band Class 17. Plaintiffs, however, do not contest that the 3GPP process itself was strictly followed. That is, technical arguments supporting the creation of Band Class 17 were set out in writing for evaluation by experts,

and the 3GPP acted by a consensus with no objection from anyone concerning Band Class 17.

B.  Alleged Delay of Band Class 12 Standards

Plaintiffs assert that after the Defendants "caused 3GPP to fragment Band 12 by creating Band 17, AT&T and the other Defendants continued to preserve what their concerted action had wrought (*i.e.*, AT&T's private ecosystem) when that private ecosystem was threatened by Cellular South."  After Plaintiffs filed the aforementioned petition for rulemaking with the FCC, Plaintiffs maintain that AT&T and the other Defendants agreed to improperly delay Band Class 12 standards.  Plaintiffs contend that they "do[] not claim that the Defendants' opposition to the Interoperability Petition before the FCC was actionable . . . Rather, the Complaint alleges that it was the Defendants' conduct beyond its opposition before the government in threatening Cellular South with the delay of Band 12, actually delaying Band 12, and attempting to secure Cellular South's withdrawal of the Interoperability Petition which was, and is, actionable."  Plaintiffs maintain that while Band Class 12 was recognized prior to "Auction 73," "work was left to be done by 3GPP to develop the technical specifications necessary for the implementation of Band 12 by carriers and equipment manufacturers."  Plaintiffs maintain that Defendants "block[ed] and/or delay[ed]" the development of such specifications.  To support this assertion, Plaintiffs set forth factual evidence in the form of comments made by employees of Motorola and Qualcomm.

First, Plaintiffs maintain that in May 2010—approximately two years after Band Class 17 was created—Qualcomm representative, Michael Chard, allegedly stated to Brian

8

Caraway of Cellular South that "there may be individuals participating in 3GPP discussions who would oppose amendments to the Band 12 standard." Chard allegedly also commented that the Interoperability Petition was a "conflict generator" and that "there could be some 'blocking' of Band 12 by the 3GPP participants that were concerned about the Interoperability Petition." In the same conference call, Chard also allegedly stated that "Qualcomm was concerned that the actions of the companies that filed the Interoperability Petition – including Cellular South – conflicted with the best interests of Qualcomm's 'other carrier partners.'" In Plaintiffs' brief in opposition to the motions to dismiss, Plaintiffs contend that "Chard's reference to its 'carrier partners' . . . had to include AT&T." Chard also allegedly commented that "most if not all of what happens in RAN 4 [discussions] happens before the meeting."

Second, Plaintiffs contend that at a June 2010 3GPP meeting, Gene Fong of Qualcomm had a conversation with Brian Caraway of Cellular South. When asked by Caraway if the Interoperability Petition had caused delays in the advancement of Band 12 standards, Fong allegedly stated, "I would be lying if I said no." However, Fong then also stated, "but I am still going to do my job." Fong also allegedly noted that Qualcomm's position on adoption of Band Class 12 standards was subject to "external influences."

Third, Plaintiffs assert that at the same 3GPP June 2010 meeting, Edgar Fernandes of Motorola, who was also the Vice Chairman of the RAN 4 Working Group at 3GPP, asked Brian Caraway of Cellular South and others if their companies were part of the group that had filed the Interoperability Petition. Caraway confirmed that Cellular South, among others, had filed the Interoperability Petition. Fernandes allegedly stated to Caraway that the

petition and related filings "have made us hesitant to do anything with Band 12." Fernandes also allegedly commented that the petition "had gummed up the works."

As it relates to these comments from Qualcomm and Motorola employees, Plaintiffs argue that because they "came virtually simultaneously, it is clear that they acted in concert both to protect the newly created AT&T private ecosystem and to punish Cellular South for its role in filing the Interoperability Petition." Plaintiffs further maintain that the "only interpretation that can be given to these statements which directly evidence concerted action is that Motorola and Qualcomm were acting at least with AT&T." Plaintiffs additionally assert that Qualcomm refused to build chipsets that function on Band Class 12; however, Plaintiffs concede that "[s]hortly thereafter . . . Qualcomm announced that it had decided to build a Band 12 chip after all." Plaintiffs maintain that Qualcomm decided to build the Band 12 chip to "cover its tracks" concerning the alleged conspiracy. According to Plaintiffs, the revised final standards for Band 12 were approved by 3GPP in November 2010.

C. Exclusive Dealing

Plaintiffs also base their antitrust claims on alleged exclusive dealing arrangements. That is, Plaintiffs proffer that, "on information and belief, Cellular South believes that AT&T has secured its 4G-LTE devices on an exclusionary basis." In their response in opposition to the motions to dismiss, Plaintiffs contend that, "[t]hose [alleged] formal agreements, whose existences and whose content are known (at least before the parties to this litigation have conducted discovery) solely to the defendants, are susceptible to legal attack under Section 2 of the Sherman Act as they are under Section 1."

D. Roaming

Plaintiffs additionally set forth allegations concerning AT&T's "increased power and opportunity" to deny Cellular South roaming on AT&T's national network. Roaming services are essentially network services that customers of regional carriers, such as Cellular South, may utilize when outside of their service area. Plaintiffs contend that "[b]ased on prior knowledge and experience, AT&T will abuse its monopoly power over 4G-LTE nationwide data roaming in the Lower 700 MHz spectrum to delay or refuse to provide meaningful nationwide roaming to [Plaintiffs]." As the complaint sets forth by its very language, and as Plaintiffs concede in oral argument, Plaintiffs' claim for denial of roaming is not based on any action that AT&T has already taken. Rather, it is based on a course of future action that AT&T, at some point, may pursue.

***Summary of Plaintiffs' Antitrust Claims***

Plaintiffs maintain that Defendants' alleged conduct presents a "very mixed combination" of (a) concerted action by all three Defendants; and (b) unilateral abuse of monopoly power by AT&T." Plaintiffs allege that these claims fall under both Section 1 and 2 of the Sherman Act. According to Plaintiffs, the complaint "has alleged a claim for violation of Section 1 arising out of two types of conduct: (1) the Defendants' collective and concerted action to fragment and delay Band 12, delaying the development of Band 12 devices and depriving Cellular South and others of roaming; and (2) AT&T's exclusive agreements with manufacturers to produce Band 17 devices, and refusal to sell devices to AT&T's competitors."

Plaintiffs' complaint further alleges that AT&T is also liable under Section 2 of the Sherman Act. Plaintiffs contend that, in assessing Section 2 liability, "AT&T's conduct must be considered as a whole – including the creation of Band 17, the agreements with device manufacturers, and AT&T's pattern of conduct designed to deprive competitors of roaming access."

*Legal Standards*

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must state a claim upon which relief can be granted or the complaint may be dismissed with prejudice as a matter of law. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss for failure to state a claim, the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004) and Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)). To withstand a Rule 12(b)(6) motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570–72, 127 S. Ct. 1955.

Rule 8 of the Federal Rules of Civil Procedure sets out the fundamental pleading standard for civil litigation and governs all claims in a civil suit, requiring "a short plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "A plaintiff's obligation to provide the 'grounds of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S. Ct. 1955. Factual allegations must be

12

enough to raise a right to relief above the speculative level. Id. Although the Supreme Court in Twombly stressed that it did not impose a probability standard at the pleading stage, the allegation of a mere possibility of relief does not satisfy the threshold requirement of Rule 8(a)(2) that the "plain statement" of a claim include factual "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief. Id. at 557, 127 S. Ct. 1955; see also Ashcroft v. Iqbal, 556 U.S. 662, --- , 129 S. Ct. 1937, 1953, 173 L. Ed. 2d 868 (2009).

When ruling on a motion to dismiss under Rule 12(b)(6), a court must accept as true all of the factual allegations contained in the complaint. Twombly, 550 U.S. at 555-56, 127 S. Ct. 1955 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Neitzke v. Williams, 490 U.S. 319, 326–27, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989); Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)). But, a court need not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions," which will not defeat a Rule 12(b)(6) motion to dismiss. Plotkin v. IP Axess, Inc., 407 F.3d 690, 696 (5th Cir. 2005) (citing Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004)).

In Iqbal, the Court formalized a two-pronged approach to apply the underlying jurisprudential principles of Twombly. The first prong requires the Court to separate factual allegations from legal conclusions. Id. The Court in Iqbal dismissed those allegations deemed to be "conclusory" on the basis that bare legal conclusions are not entitled to the privilege that all well-pleaded facts be taken as true at the motion to dismiss stage. Id.[8] The

---

[8] Iqbal illustrated its analysis of the first prong as follows:

second prong then applies the plausibility test to the remaining allegations. Id. (explaining that although the court must "take all of the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). That two-pronged approach is now the standard for evaluating the plausibility of a complaint under Rule 8(a)(2).

*Discussion and Analysis*

### Section 1 Claim Against All Defendants

Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States,

---

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint ¶ 96, App. to Pet. for Cert. 173a–174a. The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, id., ¶ 10, at 157a, and that Mueller was "instrumental" in adopting and executing it, id., ¶ 11, at 157a. These bare assertions, much like the pleading of conspiracy in Twombly, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929, namely, that petitioners adopted a policy " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group ." Feeney, 442 U.S., at 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870. As such, the allegations are conclusory and not entitled to be assumed true. Twombly, *supra*, 550 U.S., at 554–555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in Twombly rejected the plaintiffs' express allegation of a "'contract, combination or conspiracy to prevent competitive entry,'" id. at 551, 127 S. Ct. 1955, 167 L. Ed. 2d 929, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

Id. at 1951.

or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Although § 1 could be read to outlaw all contracts, it has long been interpreted to only proscribe unreasonable restraints. See Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877, 885, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007). To establish a § 1 violation, a plaintiff must prove that: (1) the defendants engaged in a conspiracy; (2) that restrained trade; (3) in the relevant market. See Apani Sw., Inc. v. Coca-Cola Enter., Inc., 300 F.3d 620, 627 (5th Cir. 2002). Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the per se rule or the rule of reason. See Spectators' Commc'n Network, Inc. v. Colonial Country Club, 253 F.3d 215, 222-23 (5th Cir. 2001). If the court determines that the defendant's conduct "would always or almost always tend to restrict competition and decrease output," the restraint is per se illegal and no further inquiry occurs. Id. However, if the conduct is not deemed per se unreasonable, the plaintiff will also have to prove that the conduct unreasonably restrains trade in light of actual market forces under the rule of reason. Id.[9]

Regarding the conspiracy element, the Supreme Court recently observed that "the crucial question [in a § 1 claim] is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." Twombly, 550 U.S. at 553 127 S. Ct. 1955 (internal quotations omitted). The plaintiff must present evidence that the defendants

---

[9] Plaintiffs contend that the Court "need not make the determination about whether the per se or rule of reason applies at this juncture since that question need not be decided the context of the current motions." The Court agrees. See TruePosition, Inc. v. LM Ericsson Telephone Co., 2012 WL 22075, at *18 (E.D. Pa. Jan. 6, 2012) ("We agree with the Defendants that a decision concerning the standard we will use [i.e., rule of reason or per se] to determine whether the restraint on trade is unreasonable is a premature question if the Complaint fails to allege a conspiracy. Therefore, we will reach this question only if we find that TruePosition has sufficiently alleged a conspiracy.").

engaged in concerted action, defined as having "a conscious commitment to a common scheme designed to achieve an unlawful objective." <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984). Concerted action may be shown by either direct or circumstantial evidence. Direct evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences in order to support a conspiracy claim. <u>See</u> <u>Tunica Web Adver. v. Tunica Casino Operators Ass'n</u>, 496 F.3d 403, 409 (5th Cir. 2007). Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1. <u>See</u> <u>Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955.

As noted *supra*, Plaintiffs "ha[ve] alleged a claim for violation of Section 1 arising out of two types of conduct: (1) the Defendants' collective and concerted action to fragment and delay Band 12, delaying the development of Band 12 devices and depriving Cellular South and others of roaming; and (2) AT&T's exclusive agreements with manufacturers to produce Band 17 devices, and refusal to sell devices to AT&T's competitors." While, in considering whether Plaintiffs' allegations state an antitrust violation, the Court considers the allegations together, the Court analyzes each allegation separately in order to flesh out all of Plaintiffs' arguments in more detail.

A. <u>3GPP and the Creation of Band Class 17</u>

The genesis of Plaintiffs' antitrust claims begins in 2008. Plaintiffs maintain that "AT&T – with the assistance of Motorola and Qualcomm – [ ] caused the 3GPP to create a private band for the benefit of AT&T." During oral argument on this issue, Plaintiffs again

reiterated that Motorola "started" the alleged concerted action by proffering a paper at the 2008 3GPP meeting recommending the creation of a separate band class.    While Plaintiffs contend that Motorola would never have made its 2008 proposal at 3GPP to create Band Class 17 without the "prior consent, blessing, and agreement of AT&T," Plaintiffs provide no factual support for such a proposition either in the complaint or the response in opposition to Defendants' motions to dismiss.  Due to this factual void in Plaintiffs' filings, the Court inquired from Plaintiffs at oral argument what facts they had to support the claim that Motorola recommended the creation of a separate band class based on a prior "agreement" with AT&T.  Plaintiffs, instead of providing *facts*, simply maintained that Motorola "had to have talked to AT&T about it."  Plaintiffs further stated, "We can be reasonably assured that Motorola did not change AT&T's spectrum because it made a difference to AT&T."  Plaintiffs, as to this issue, additionally stated, "That just doesn't happen."

Plaintiffs have articulated the same threadbare allegations concerning Qualcomm as it relates to the creation of Band Class 17 in 2008. Plaintiffs contend that, in June 2008, AT&T and Qualcomm joined Motorola in support of the creation of Band Class 17. According to Plaintiffs, "Qualcomm's support, like Motorola's . . . can only be explained by a preceding agreement with AT&T."  Plaintiffs provide *no* factual support for such an assertion.  In fact, when questioned about whether Plaintiffs had any facts to support the proposition that there was a prior agreement amounting to concerted action, Plaintiffs simply reiterated that Motorola "started it," Qualcomm "supported it," and "they had to have some reason to do it."  Plaintiffs continued with this highly speculative and entirely conclusory

17

argument, noting that the parties "had strong motives to act in concert" because they "needed AT&T as a customer."

While Plaintiffs maintain that Qualcomm and Motorola had such "motives" to engage in concerted action, accusations of a motive do not establish a Sherman Act violation, and Plaintiffs provide no factual allegations to plausibly show the existence of an agreement. That is, there are no allegations of when such a purported agreement happened, nor are there facts showing that particular individuals met at particular times, or even what such an alleged agreement entailed. It should go without saying that merely articulating that an agreement "had to have" occurred prior to Motorola's 2008 recommendation to create a separate band class is not a *factual* allegation that raises Plaintiffs' right to relief above the speculative level in accordance with Twombly. See Twombly, 550 U.S. at 565 n.10, 127 S. Ct. 1955; TruePosition, Inc. v. LM Ericsson Tel. Co., 2012 WL 33075, at *21 (E.D. Pa. Jan. 6, 2012). Even if Motorola, Qualcomm, and AT&T all supported the creation of Band Class 17 during the 3GPP process—due to what each contend is technologically justified because of interference concerns with the Lower A Block—"[c]ircumstantial evidence of parallel behavior must be pled in 'a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" Burtch v. Milberg Factors, Inc., 662 F.3d 212, 226–27 (3d Cir. 2011) (quoting Twombly, 550 U.S. at 557, 127 S. Ct. 1955). "Parallel conduct in itself is insufficient to state a claim for conspiracy because it is 'consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions in the market.'" Id. (quoting Twombly, 550 U.S. at 554, 127 S. Ct. 1955).

18

Here, other than Plaintiffs' conclusory statements that an agreement happened regarding the creation of Band Class 17, the only factual allegations provided show that Motorola, Qualcomm, and AT&T participated in the 3GPP process. Yet, the Fifth Circuit has consistently maintained that "it has long been recognized that the establishment and monitoring of trade standards is a legitimate and beneficial function." Consol. Metal Prods. Inc. v. Am. Petroleum Inst., 846 F.2d 284, 293-94 (5th Cir. 1988) (finding that though a trade association naturally involves collective action by competitors, it is not by its nature a "walking conspiracy"). In Golden Bridge Technology, Inc. v. Motorola, Inc., 547 F.3d 266 (5th Cir. 2008), the court affirmed summary judgment in a challenge brought by the developer of wireless communications technologies for cellular networks against other members of the 3GPP nonprofit origination. There, Golden Bridge Technology, a member of 3GPP, alleged that the defendants unlawfully conspired not to deal with Golden Bridge in violation of the Sherman Act. Id. The Fifth Circuit, in addressing the function of the 3GPP, noted as follows:

> The standards 3GPP sets allow the numerous necessary components of cellular communications to operate compatibly. Potential procompetitive benefits of standards promoting technological compatibility include facilitating economies of scale in the market for complementary goods, reducing consumer search costs, and increasing economic efficiency. See ABA Section of Antitrust Law, Handbook on the Antitrust Aspects of Standard Setting 10 (2004).

Id.; see also, e.g., Consolidated Metal Prods., 846 F.2d at 294; TruePosition, 2012 WL 33075, at *2 (dismissing antitrust claim based on alleged conspiracy to exclude technology from 3GPP standard).

To be clear, the Court is not holding that joint standard setting cannot be the basis of a Sherman Act violation, as such standard setting has been successfully challenged under Section 1. See Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 108 S. Ct. 1931, 100 L. Ed. 2d 497 (1988). Plaintiffs rely heavily on Allied Tube to support their claim. However, Allied Tube is quite distinguishable.

In that case, the Supreme Court addressed both the risks and benefits of standard-setting. The case involved a steel manufacturing corporation that set out to convince an SDO not to change its standards in a way that would negatively affect steel manufacturers. Id. at 495-97, 108 S. Ct. 1931. The standards setting organization, the National Fire Protection Association, published the National Electric Code each year. Until 1981, the Code had approved only steel as an electrical conduit. When a new material suitable for use as an electrical conduit became available, the steel company rounded up everyone it could to vote against incorporating this new material into the code as another viable material for electrical conduits. Id. (stating the facts). The issue in the case was whether this behavior violated Section 1 of the Sherman Act by unreasonably restraining trade, or whether the steel company was immune from such liability because it was merely lobbying a legislative body for the result it desired. Id. at 495, 108 S. Ct. 1931 (citing Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961) (providing antitrust immunity for individuals who petition the government to adopt a rule or law that would restrain trade)).

The Court in Allied Tube held that the steel company did not enjoy any such immunity. Id. at 509-10, 108 S. Ct. 1931. The Court found that the steel company, which

had a clear economic interest in stifling competition from this new material, *was biasing the standard setting process*. It therefore refused to grant the steel company antitrust immunity, and concluded that efforts to influence private standard setting organizations *may* violate antitrust laws. Id. at 509-10, 108 S. Ct. 1931.

Unlike Allied Tube, which involved a standard setting process that was biased through the use of improper and unfair practices and procedures, see Clamp-All Corp. v. Cast Iron Soil Pipe Institute, 851 F.2d 478, 488 (1st Cir. 1988) (Breyer, J.) (discussing Allied Tube), in this case *sub judice*, the Defendants' conduct during the 3GPP process in 2008 is, on its face, lawful. While Plaintiffs argue that Defendants' technical justifications set forth during the 3GPP process are merely pretext for anticompetitive behavior, the 3GPP process was followed to the letter. That is, there are no facts demonstrating procedural irregularities within the process, that the 3GPP process was subverted or turned into a sham, or that the Defendants agreed to employ—or indeed did employ—any improper practices within the standard setting process. The highly complex and technical arguments in favor of creating Band Class 17 were set out in writing for evaluation by experts, and the concerns relating to such creation of Band Class 17 were duly contemplated at 3GPP meetings. The 3GPP acted by a consensus as it relates to the creation of Band Class 17, and there was no objection from any person or entity, including the Plaintiffs and Verizon Wireless, who also holds spectrum licenses in the Lower A Block. As the Court made clear in Golden Bridge,

> We have found it "axiomatic" that a standard setting organization must exclude some products, and such exclusions are not themselves antitrust violations. See Consol. Metal Prods., 846 F.2d at 294 . To hold otherwise would stifle the beneficial functions of such organizations, as "fear of treble damages and judicial second-guessing would discourage the establishment of useful industry standards." Id. at 297. Accordingly, we decline to infer

> conspiratorial action on the basis of limited circumstantial evidence, particularly where this evidence is at least as consistent with permissible competition, and with independent action, as with unlawful conspiracy. <u>See</u> <u>Matsushita</u>, 475 U.S. at 588, 106 S. Ct. 1348.

547 F.3d at 273.  Here, Plaintiffs have not alleged plausible facts demonstrating that the 3GPP standard setting process was biased or otherwise subverted, or that the Defendants engaged in any type of conspiracy or concerted action as it relates to the creation Band Class 17.

    B.  <u>Delaying Development of Band Class 12 Devices</u>

Plaintiffs additionally contend that AT&T agreed with Defendants Motorola and Qualcomm to improperly delay Band Class 12 standards. During oral argument, Plaintiffs attempted to clarify their argument related to the alleged delay of Band Class 12.  Plaintiffs maintain that, in order to preserve Band Class 17, the Defendants conspired to delay the finalization of Band Class 12, and that such a threat was made in order to force Cellular South to withdraw its Interoperability Petition filed with the FCC.  At the outset, the Court notes that the Plaintiffs, during oral argument, noted that Band Class 12 was, in reality, only "slightly delayed at 3GPP."  Plaintiffs made clear that the standards for Band Class 12 were in fact already set prior to "Auction 73," but there were still some "finalizations" to be made. To support its contention that delay was at least threatened, Plaintiffs point to comments made by employees of Qualcomm and Motorola.[10]  These comments are as follows:

- First, that a Qualcomm employee (Michael Chard), two years after Band Class 17 was created, stated that there **may be** individuals participating in

---

[10] The Court notes that Plaintiffs do not point to any comments made by AT&T or any commentary made by any individual referencing any action taken by AT&T.

3GPP discussions who would oppose amendments to the Band 12 standard. That the same Qualcomm employee also stated that the petition was conflict generator, that there **could be** some blocking of Band 12 by the 3GPP participants that were concerned about the petition, that Qualcomm was concerned that the petition conflicted with the interests of its other carrier partners, and that most of what happens at the RAN 4 3GPP meetings happens before the meeting.[11]

- Second, that another Qualcomm employee (Gene Fong) was asked at a June 2010 3GPP meeting if the petition had caused delays in the advancement of Band 12 standards, and the response was, "I would be lying if I said no . . . but I am still going to do my job." The employee also allegedly stated that Qualcomm's position on the adoption of Band Class 12 standards was subject to external influences.[12]

- Third, that the Vice Chairman of RAN 4, who is also a Motorola employee (Edgar Fernandes), stated that the petition and related filings "have made us hesitant to do anything with Band 12" and that the petition "had gummed up the works."[13]

As it relates to such comments, Plaintiffs first contend that they are "direct evidence" of concerted action taken by the Defendants. Allegations of direct evidence of an unlawful agreement must be "explicit and require[ ] no inferences to establish the proposition or conclusion being asserted." In re Baby Food Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999); Golden Bridge, 547 F.3d at 272 ("Direct evidence explicitly refers to an understanding between the alleged conspirators"); Tunica, 496 F.3d at 410 (finding that

---

[11] While a Qualcomm employee allegedly stated that there "could be" blocking by such unnamed 3GPP members, there is no allegation that any blocking actually occurred.

[12] The Court notes that even Plaintiffs' version of this conversion (which is taken as true) only states that the petition itself caused delay in Band 12. The comment from Gene Fong does not state, or even infer, that an "agreement" or a "conspiracy" between any individuals or entities, much less the Defendants to this action, could or would cause such delay.

[13] As noted in relation to the comment made by Gene Fong, the comment made by Edgar Fernandes states that the petition and related filings "gummed up the works." The comment does not state nor infer that any agreement or concerted action by any of Defendants caused or threatened such alleged delay.

email communications show conspiracy because they contain direct evidence stating that the parties entered into a "gentlemen's agreement" not to deal with another company). Here, unlike Tunica, the statements made by Qualcomm and Motorola employees do not constitute direct evidence of any type of conspiracy. Accordingly, the Court reviews such allegations under the standard required for circumstantial evidence.

As discussed above, regarding the conspiracy element, the Supreme Court has observed that "the crucial question [in a § 1 claim] is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." Twombly, 550 U.S. at 544, 127 S. Ct. 1955. (internal quotations omitted). A plaintiff must present evidence that the defendants engaged in concerted action, defined as having "a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984). Plaintiffs here have failed to present evidence of a conspiracy, either to create Band Class 17, or to preserve Band Class 17 by delaying Band Class 12. Plaintiffs have in fact failed to point to any action taken, or any agreement to take action, by any of the Defendants that delayed or resulted in some delay of any Band Class 12 standards, specifications, or technical finalizations. Instead, Plaintiffs cite to comments made by Qualcomm and Motorola employees over a year after Band Class 17 was adopted without objection, that do not refer to any agreement, much less an agreement by the party Defendants to this action. The comments at most can be said to plausibly show that the FCC petition inserted uncertainty or delay into Band Class 12 finalization and "may" have caused certain—unnamed and apparently unknown—members of the world wide 3GPP organization "hesitant" to proceed

with Band Class 12 development. The comments do nothing to suggest any "agreement" or conspiracy between Qualcomm, Motorola, and AT&T, much less an unlawful and speculative agreement that "had to have" initially occurred at some unknown time prior to the 2008 3GPP meeting and resulted in three multinational companies submitting numerous public and fraudulent technical papers and related filings to a standard setting organization and the FCC in order to harm Cellular South, a smaller regional carrier.[14]

Plaintiffs additionally cite evidence that Qualcomm initially allegedly announced it would not supply Band Class 12 chips. However, Qualcomm—only one month later—unilaterally and publically announced it would supply such chips. Plaintiffs have provided no factual evidence suggesting there was an agreement between Motorola, AT&T, and Qualcomm not to provide such chips, much less that it was agreed amongst the Defendants—one month later—to change course and supply Band Class 12 chips after all. In fact, both alleged announcements were made publically by Qualcomm. Nevertheless, it is not enough for Cellular South to state Qualcomm initially refused to supply Band Class 12 chips, as Cellular South cannot claim that Qualcomm had an obligation under federal antitrust law to engage in the immediate development of chips in order to satisfy Cellular South's needs as they related to Band Class 12. Far to the contrary; Cellular South has the burden to allege a plausible *agreement* between the Defendants to delay such Band Class 12

---

[14] Each of the comments allegedly made occurred after the petition for rulemaking and after each of the Defendants had already set forth in public filings its opposition on technical grounds to the regulatory relief that Cellular South and other carriers had requested. As Cellular South even recognizes, it was publically known that AT&T, Verizon, and numerous others in the industry opposed the regulatory relief requested by Cellular South.

devices and standards. Neither the complaint and memorandum brief nor oral arguments proffered by Plaintiffs plausibly allege such an agreement.

C.  Denial of Roaming

Plaintiffs' antitrust allegations also concern AT&T's alleged refusal to provide roaming services[15] access to Cellular South. Plaintiffs maintain that "[b]ased on prior knowledge and experience, AT&T will abuse its monopoly power over 4G-LTE nationwide data roaming in the Lower 700 MHz spectrum to delay or refuse to provide meaningful nationwide roaming." As the very language of Plaintiffs' complaint illustrates, Plaintiffs claims do not challenge any present conduct taken by AT&T. Instead, such a claim is based on allegations that AT&T might, at some point in the future, deny roaming access. In fact, Plaintiffs have yet to request roaming services from AT&T. When questioned about such allegations during oral argument, Plaintiffs maintained that they are asking the Court to "fence [AT&T] in" as it relates to roaming services. The Court finds that such speculative assertions about conduct that may—or may not—occur in the future is not a proper basis for seeking relief here. Just as conclusory allegations that an agreement "had to have" occurred do not plausibly state a claim for relief under Twombly, conclusory speculation regarding what could happen at some unknown date in the future also fails to plausibly state a violation of federal antitrust laws. See Twombly, 550 U.S. at 555, 127 S. Ct. 1955.

Additionally, the Court notes that when mobile wireless carriers must provide roaming access is already the subject of FCC regulation, see 47 C.F.R. § 20.12, and Cellular South has not alleged that AT&T has presently failed to comply with its regulatory

---

[15] As noted *supra*, roaming services are network services that customers of Cellular South may utilize when outside of Cellular South's service area.

obligation to provide roaming access on commercially reasonable terms and conditions. Further, beyond this regulatory obligation, Plaintiffs have not alleged that AT&T has an independent duty under federal antitrust laws to provide roaming services to one particular regional company such as Cellular South. Indeed, such antitrust laws generally do not "'restrict the long recognized right of [a] trader or manufacturer . . . freely to exercise his own independent discretion as to parties with whom he will deal.'" Verizon Commc'ns Inc. v. Law Offices of Curts v. Trinko, LLP, 540 U.S. 398, 408, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004) (quoting United States v. Colgate & Co., 250 U.S. 300, 307, 39 S. Ct. 465, 63 L. Ed. 992 (1919)).

However, as the Trinko Court recognized, "'[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.'" 540 U.S. at 408, 124 S. Ct. 872 (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985)). "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." Trinko, 472 U.S. at 408, 124 S. Ct. 872. The Supreme Court, however, has been "very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." Id. The leading case for § 2 liability based on refusal to cooperate with a rival is Aspen Skiing, a case upon which all parties to this litigation understandably devote time to discussing.

The Aspen ski area consisted of four mountain areas. Aspen Skiing, 472 U.S. 585, 105 S. Ct. 2847. The defendant in Aspen Skiing, who owned three of those areas, and the

27

plaintiff, who owned the fourth, had cooperated for years in the issuance of a joint, multiple-day, all-area ski ticket. After repeatedly demanding an increased share of the proceeds, the defendant canceled the joint ticket. The plaintiff, concerned that skiers would bypass its mountain without some joint offering, tried a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price. Id. at 593-94, 105 S. Ct. 2847. The defendant refused even that. The Supreme Court upheld a jury verdict for the plaintiff, reasoning that "[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." Id. at 608, 105 S. Ct. 2847.

As the Trinko Court expressly made clear, "Aspen Skiing is at or near the outer boundary of § 2 liability." Trinko, 540 U.S. at 409, 124 S. Ct. 872. The Court in Aspen Skiing found significance in the defendant's decision to cease participation in a cooperative venture. Aspen Skiing, 472 U.S. at 608, 610-11, 105 S. Ct. 2847. The Court found that the unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. Id. Similarly, the Court concluded that the defendant's unwillingness to renew the ticket even if compensated at retail price revealed a distinctly anticompetitive bent. Id. Moreover, in Aspen Skiing, the defendant turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher. Id.

In the case *sub judice*, the claims related to an alleged refusal to deal do not fit within the "limited exception" recognized by Aspen Skiing. Trinko, 540 U.S. at 409, 124 S. Ct.

872; see also Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango, 582 F.3d 1216, 1224-25 (10th Cir. 2009) (quoting Trinko, 540 U.S. at 409, 124 S. Ct. 872) (emphasis in original) ("Aspen Skiing controls *only* where the monopolist's 'unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end.'"); In re Elevator Antitrust Litig., 502 F.3d 47, 53-54 (2nd Cir. 2007) (per curiam) (noting that termination after prior course of dealing is "sole exception to the right of refusal to deal"). That is, a speculative and entirely conjectural refusal to provide roaming access to Cellular South at some unknown point in the future does not state a claim under federal antitrust laws in this case.

Along the same lines, Plaintiffs have not alleged how a speculative future dispute over roaming access with one particular regional carrier could give rise to competition as a whole. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977) ("[A]ntitrust laws . . . were enacted for the protection of competition, not competitors.") (internal quotations omitted); Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market."). Accordingly, Plaintiffs' allegations concerning AT&T's alleged refusal to allow roaming services fail, as such arguments do not challenge any present conduct, provide concrete factual evidence that there is a threat of such conduct in the future, allege that AT&T has a duty under federal antitrust law to

provide such access, or factually allege how some possible future refusal to provide roaming to Cellular South will harm competition.

D. Exclusive Agreements

Plaintiffs also base their antitrust claims on alleged exclusive dealing arrangements. That is, Plaintiffs proffer that, "on information and belief, Cellular South believes that AT&T has secured its 4G-LTE devices on an exclusionary basis." Plaintiffs contend that "[u]pon information and belief, AT&T has entered into formal and informal understandings with manufacturers that limit the ability of those manufacturers to provide 4G-LTE devices to smaller carriers such as Cellular South and Corr Wireless on a timely basis." Both Plaintiffs' brief in opposition to Defendants' motions to dismiss and the contentions made at oral argument on the allegations of exclusive agreements illustrate why Twombly's plausibility standard is crucial in antitrust cases, as well as other forms of litigation. It is clear from Plaintiffs' own admissions in this case that Plaintiffs cannot plausibly allege any such agreements are actually in existence. In fact, Plaintiffs have not named a single manufacturer that has entered into an exclusive agreement—or is considering entering into such an agreement—with AT&T.

Instead, Plaintiffs assert that the "existence and [ ] content" of such alleged agreements "are known (at least before the parties to this litigation have conducted discovery) solely to the defendants." As such a statement makes clear, Plaintiffs apparently seek to utilize discovery in order to establish whether such agreements exist. That is, Plaintiffs request this Court to allow enormously expensive and protracted antitrust discovery to proceed in order so that Plaintiffs may "discover" whether they have claim for

purported exclusive dealing agreements between AT&T and such unnamed manufacturers. But, as the Court in Twombly made clear in applying the plausibility standard to a Sherman Act claim, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." 550 U.S. at 556, 127 S. Ct. Plaintiffs' complaint in this action provides no factual matter to infer an agreement "was made." Instead, Plaintiffs concede that their complaint rests on factual matter currently not known, and Plaintiffs' contention that "[w]hether such agreements exist now is a red herring" is directly contrary both to Twombly and basic pleading standards. Federal Rule 8(a)(2)— even before Twombly articulated its plausibility standard—requires Plaintiffs to set forth a "'plain statement' possess[ing] enough heft to 'sho[w] that the pleader is entitled to relief.'" Id. (quoting FED. R. CIV. P. 8(a)(2)). That is, Rule 8(a)(2) does not state that plaintiffs may set forth a plain statement showing they might be entitled to relief if they can engage in discovery and such discovery reveals the existence and content of an agreement, and such agreement is unlawful and runs afoul of federal antitrust laws. If Rule 8(a)(2) allowed a pleader to overcome a motion to dismiss for failure to state a claim simply by stating discovery could reveal such a claim, even though the "existence and content" of the claim is not yet known, Federal Rule 12(b)(6) would become utterly futile.

Antitrust litigation is expensive, see Twombly, 550 U.S. at 558, 127 S. Ct. 1955; Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528 n.17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) ("a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to

31

proceed."),[16] and while it does not require heightened fact pleading of specifics, there must be enough facts to "state a claim of relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. 1955. Plaintiffs here have not alleged a plausible claim based on exclusive dealing by AT&T, and Plaintiffs' allegations that AT&T might, at some unknown time in the future, enter into such agreements is a naked speculation that the Court shall not presume is or will become true absent factual evidence to support such. Likewise, while Plaintiffs contend that such agreements—assuming they unlawfully exist—would harm competition, Plaintiffs' complaint fails to allege facts in support of this. That is, there is no allegation of the scope of this particular market, the number of potential manufacturers, or the terms and duration of such alleged exclusive agreements. Accordingly, the Court finds Plaintiffs' complaint fails to plausibly state a claim based on alleged exclusive dealing agreements entered into by AT&T.

### Section 2 Claim

Plaintiffs' complaint further alleges that AT&T is also liable under Section 2 of the Sherman Act. Plaintiffs contend that, in assessing Section 2 liability, "AT&T's conduct must be considered as a whole – including the creation of Band 17, the agreements with

---

[16] See also Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One–Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N.Y. & U. L. Rev. 1887, 1898–1899 (2003) (discussing the unusually high cost of discovery in antitrust cases); Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed).

device manufacturers, and AT&T's pattern of conduct designed to deprive competitors of roaming access." Section 2 of the Sherman Act establishes a cause of action against single firms that monopolize, or attempt to monopolize, or conspire to monopolize, "any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2; Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc., 200 F.3d 307, 315 (5th Cir. 2000); C.A.T. Indus. Disposal, Inc. v. Browning–Ferris Indus., Inc., 884 F.2d 209, 210 (5th Cir. 1989). The Court addresses all three causes of action, and concludes that Plaintiffs' complaint fails to state a claim against AT&T under Section 2 of the Sherman Act.

A. Conspiracy to Monopolize

The Court begins by addressing Plaintiffs' conspiracy to monopolize claim. Such a claim can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the conspiracy; and (4) an effect upon a substantial amount of interstate commerce. Stewart Glass & Mirror, Inc., 200 F.3d at 316. Such proof is nonexistent here. As the Court's analysis under Section 1 demonstrates, Plaintiffs have failed to plead sufficient plausible facts of any agreement or conspiracy, anticompetitive or otherwise, between the Defendants. Because a conspiracy to monopolize claim requires joint action, Plaintiffs' deficiencies are fatal to their Section 2 claim. Accordingly, Plaintiffs' claims under Section 2 of the Sherman Act for conspiracy to monopolize shall also be dismissed.

B. Attempted Monopolization and Monopolization

Next, the Court addresses the claims of attempted monopolization and monopolization. In order to prevail on an attempt to monopolize claim under section 2, a plaintiff must prove that (1) the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. See Salts v. Moore, 107 F. Supp. 2d 732, 743 (N.D. Miss. 2000). "Unfair or predatory conduct may be sufficient to prove the necessary intent to monopolize." Id. However, intent alone is insufficient to establish the dangerous probability of success, which requires inquiry into the relevant product and geographic market and the defendant's economic power in that market. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459, 113 S. Ct. 884, 122 L. Ed. 2d 247 (citing Swift & Co. v. United States, 196 U.S. 375, 396, 25 S. Ct. 276, 49 L. Ed. 518 (1905)). "Thus, Defendants may not be liable for attempted monopolization under § 2 of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market and specific intent to monopolize." Salts, 107 F. Supp. 2d at 743.

Plaintiffs' complaints against AT&T concern allegations of exclusion from the Lower A Block 700 MHz "competitive playing field." Plaintiffs base such allegations on "three different but related types of conduct." This conduct, as quoted by Plaintiffs, is as follows:

- By creating Band 17, AT&T has excluded smaller carriers seeking to use Lower A Block spectrum from competition by denying them access to Band 12 devices and roaming access. AT&T acted with the other Defendants so this conduct is actionable under Section 1 and as a conspiracy to monopolize subject to Section 2. Wholly apart from its actions in concert with the other

34

Defendants, AT&T's conduct in creating and using Band 17 unilaterally is actionable as actual and attempted monopolization under Section 2.

- In addition, AT&T has exacerbated the effect of the creation of Band 17 by continuing its prior practice of entering into exclusive arrangements with manufacturers of wireless devices and extending it to 4G-LTE devices, with the purpose and intent of denying smaller carriers access to devices.

- Finally, by creating Band 17, AT&T has now created at least a pretextual, and perhaps a real, incompatibility that provides AT&T an excuse for denying nationwide 4G-LTE roaming to carriers using Lower 700 MHz spectrum. Moreover, AT&T's exploitation of what is effectively a private wireless ecosystem within Band 17 may enable it to build additional technical incompatibility into its network over and above that required by the difference in frequencies used by Band 12 and Band 17. Even if the Court requires AT&T to eliminate all of those technological incompatibilities, AT&T may continue the denial of roaming that is now occurring by the next step in the plan -- simply refusing to allow roaming on any feasible basis.

The Court has already addressed many of Plaintiffs' allegations under its Section 1 analysis. First, even accepting all factual allegations as true, the Court concludes that Plaintiffs have failed to state a plausible antitrust violation as it relates to the creation of Band Class 17. In fact, the only factual evidence presented as it relates to AT&T's actions regarding the creation of Band Class 17 is that AT&T supported Motorola's position on the issue during the 3GPP standard setting process.[17] There is no reference to any action AT&T has taken, other than its participation in the 3GPP, which would demonstrate anticompetitive conduct or a specific intent to monopolize. That is, there is no factual allegation that AT&T subverted or manipulated the 3GPP process to create or strengthen monopoly power. Instead, the facts alleged show that AT&T, as one company among hundreds, participated in

---

[17] As discussed *supra*, while Plaintiffs proffer, under their Section 1 claim, that an agreement between AT&T and Motorola "had to have" happened prior to Motorola's proposal in 2008 to create a separate band class, there is not a single factual allegation supporting such a conclusory assertion.

the 3GPP process, which acted by a consensus without objection as to Band Class 17. Plaintiffs' amended complaint, which adds a new theory of purported intent driving AT&T's actions, does not cure this factual pleading deficiency.

In Plaintiffs' amended complaint, it is alleged that AT&T's "motives in creating Band 17 have become even clearer in light of two recent statements of AT&T's Chief Executive Officer." The statement Plaintiffs rely on is included in Plaintiffs' complaint and is as follows:

> Yeah, most of your other large economies – and you can go through it, whether it be Korea or the large economies in Europe, Japan – there are much fewer numbers of competitors in those markets, so therefore you have a more rational allocation of spectrum. But, you know, I don't know what the optimal number is; I'm not into industrial design or industrial planning. I think our policymakers, whether it be the Department of Justice or the FCC, has got to come to a realization that the current structure will not accommodate what they want to do in terms of growing these services and these capabilities. It is – obviously, the more competitors you have, the less efficient the allocation of the spectrum will be. It just – that's mathematical. And, obviously, you know, there's probably an optimal place in there; I think the markets are more than capable of kind of sorting that out. But it's going to have to change; whether they want it to change, or not, it will probably change. I don't think the market is going to accommodate the number of competitors that are currently in the marketplace.[18]

Based on this statement, Plaintiffs maintain that AT&T sought to develop Band Class 17 in order to devalue the Lower A Block, and then purchase it for a lower price years later. Thus, Plaintiffs maintain that AT&T defrauded both the FCC and the 3GPP in order to make the Lower A Block spectrum available for purchase at a cheaper price. Such an allegation is based on layer after layer of factual speculation as to make the theory utterly implausible.

_____

[18] See Transcript of Milken Institute 2012 Global Conference, April 29-May 2, 2012, Los Angeles, A Conversation With AT&T's Randall Stephenson (11:00 AM-Wednesday May 2, 2012, at p. 2).

- First, the Court would have to assume, without factual support, that AT&T intentionally did not bid on the Lower A Block spectrum during the FCC auction in 2008 but, instead, concocted and launched a conspiracy with Motorola and Qualcomm to allow other entities, including Verizon, to buy the spectrum.

- Second, the Court would have to infer, without factual support, that AT&T, purportedly with the help or assent of the other Defendants, had the intent to devalue this spectrum by submitting numerous and public fraudulent technical submissions and related filings to both 3GPP and the FCC.

- Third, the Court would have to assume, without factual support, that Motorola and Qualcomm, among others, joined in AT&T's concocted scheme to defraud both 3GPP and the FCC by also submitting fraudulent public submissions.

- Fourth, the Court would have to accept, without factual support, that Verizon, the largest holder of A Block spectrum and a major competitor of AT&T, simply acquiesced to the actions taken by AT&T at 3GPP that were, according to Plaintiffs, taken to devalue the very spectrum it had just purchased.[19]

- Fifth, the Court would have to assume, without factual support, that AT&T engaged in this conduct with the foresight that the Lower A Block spectrum would be devalued, thus allowing AT&T the ability to possibly purchase the spectrum from A Block carriers four years later for a lower price.

Such suggestions based on entirely unsupported factual predicates create only implausible speculations. Moreover, inserting into an amended complaint a factually unsupported yet possible "motive" on AT&T's part does not establish an antitrust violation.

As it relates to Plaintiffs' claims of exclusionary conduct, the Court has already addressed Plaintiffs' allegations regarding AT&T's alleged exclusive agreements with manufacturers. Other than providing a blanket assertion that such agreements exist and/or

---

[19] For clarification, the Court notes that Verizon did not object to the creation of Band Class 17 at 3GPP in 2008.

will exist at some unknown time in the future, Plaintiffs provide no facts plausibly supporting such an allegation. Plaintiffs' speculative claims concerning roaming access are also discussed in more detail above and they fall on the same footing as Plaintiffs' allegations related to exclusive dealing agreements. The complaint does not allege that AT&T has ever denied Cellular South the opportunity to roam, or that AT&T even has a duty under antitrust law—as opposed to a regulatory obligation from the FCC—to allow Cellular South to do so.

Plaintiffs' claims of monopolization, as distinguished from attempted monopolization, also fail. As noted, Section 2 of the Sherman Act declares that a firm shall not "monopolize" or "attempt to monopolize." It is settled law that this offense requires, in addition to the possession of monopoly power in the relevant market, "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966); Trinko, 540 U.S. at 407, 124 S. Ct. 872. "The mere possession of monopoly power . . . is not only not unlawful; it is an important element of the free-market system." Trinko, 540 U.S. at 407, 124 S. Ct. 872. As the Supreme Court has made clear, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." Id. (emphasis in original). Plaintiffs' complaint is void of plausible factual allegations illustrating anticompetitive conduct on the part of AT&T. While Plaintiffs' complaint details, in 146 pages, its allegations and the background leading up to this action, Twombly does not require longer

complaints. <u>Twombly</u>, instead, requires that a complaint state enough facts, as opposed to conclusions, so that relief is plausible. That is, Plaintiffs must "nudge[] their claims across the line from conceivable to plausible." Plaintiffs have failed to do so here.

<em>Conclusion</em>

For the foregoing reasons, Defendants' motions to dismiss for failure to state a claim brought pursuant to Federal Rule of Civil Procedure 12(b)(6) shall be granted. Because the Court has concluded that such motions are due to be granted, Defendants' motions to dismiss pursuant to the doctrine of primary jurisdiction are deemed moot.

SO ORDERED, this the 31st day of August, 2012.

**/s/ Sharion Aycock**
**U.S. DISTRICT JUDGE**