**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

**CORR WIRELESS
COMMUNICATIONS, L.L.C.,
CELLULAR SOUTH, INC., and
CELLULAR SOUTH LICENSES, LLC**          **PLAINTIFFS**

**VS.**                    **CIVIL ACTION NO. 3:12-cv-036-SA-SAA**

**AT&T, INC., AT&T MOBILITY LLC,
MOTOROLA SOLUTIONS, INC.,
MOTOROLA MOBILITY, INC.,
QUALCOMM INCORPORATED, and
JOHN DOES 1-10**                       **DEFENDANTS**

## REPLY MEMORANDUM IN SUPPORT OF

## MOTION FOR TIME TO FILE MOTION TO AMEND COMPLAINT

Plaintiffs Corr Wireless Communications, L.L.C., Cellular South, Inc. and Cellular South Licenses, LLC (collectively, Cellular South) seek additional time to file a Motion to Amend Complaint. Defendants have opposed that motion. This Reply Memorandum is submitted in support of Plaintiffs' Motion for time until September 30, 2012 to allow filing a motion to amend complaint.

Defendants have not suggested, nor can they plausibly suggest, that allowing Cellular South additional time would prejudice their interests in any way. Indeed, after the vehement arguments from the Defendants that this case required no expedited schedule, it is surprising to see a Joint Opposition (filed within less than twenty four hours) to a motion that simply seeks time. Clearly, time is not the real issue here. Instead, the Defendants simply want to avoid any amendment. However, opposing a motion for time to prepare an amendment to a complicated

and lengthy complaint, which involves a study of detailed proceedings of 3GPP, is not the way to address that issue.

The other argument advanced by Defendants is no better: "If plaintiffs had more facts, they would have used them." That argument ignores the many cases in which a complaint is appropriately clarified to address particular issues addressed by the Court. Such an amendment was made in *TruePosition, Inc. v. LM Ericsson Tel. Co., et al.*, No. 11-4574 (E.D. Pa. Aug. 21, 2012). After the amendment, the court denied the subsequent motion to dismiss. Given Qualcomm's involvement in that case, which related to taken at 3GPP, the Defendants actually oppose the motion for time because they fear that the actual facts relating to 3GPP, which are different from those which the Defendants have tried to urge upon the Court, may cause this Court to reach a different result.

## The Law

The argument of the Defendants that "if they had more facts they would have used them" is completely at odds with the settled law.

Although the determination of whether to grant leave to amend a complaint is within the sound discretion of the court, that discretion is limited by the explicit language of FED. R. CIV. P. 15(a), which provides that "[t]he court should freely give leave [to amend] when justice so requires." "Rule 15(a) expresses a **strong** presumption in favor of liberal pleading . . . ." *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997) (emphasis added) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). While it is acknowledged that leave to amend is not automatic, the Supreme Court has held that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). *See also United States*

*ex rel. Willard. v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 386-87 (5th Cir. 2003) ("The liberal amendment policy underlying Rule 15(a) affords the court broad discretion in granting leave to amend and, consequently, a motion for leave to amend should not be denied unless there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed [or] undue prejudice to the opposing party by virtue of allowance of the amendment . . . .'" (citing *Foman*, 371 U.S. at 182)); *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 841 (5th Cir. 2002) ("[A] district court must have a 'substantial reason' to deny a request for leave to amend." (citation omitted); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 205 (5th Cir. 1969) ("Summary disposition of litigation, especially antitrust cases, is disfavored and amendments should be liberally granted so that all cases may be decided on their merits").[1]

## There Are Relevant Facts

Since the Defendants have raised the "no facts" argument, Cellular South has no choice but to extend this Reply by providing a partial enumeration of some of the facts to be included in the proposed amended complaint which is still in the process of preparation.

The primary thrust of the amended complaint will be to more precisely describe the actual proceedings of 3GPP related to the creation of Band 17. The plaintiffs believe that the Court's Memorandum Opinion was predicated on a misapprehension, created by the Defendants

---

[1] *See also Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *3 (N.D. Cal 2012) (granting leave to amend antitrust complaint to plead specific facts supporting Sherman Act § 1 claims); *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1200-02 (S.D. Tex. 2009); *E.I. Du Pont De Nemours and Co. v. Kolon Indus., Inc.*, 683 F. Supp. 2d 401, 427 (E.D. Va. 2009) (granting leave to amend antitrust complaint to allege a relevant geographic market and anticompetitive conduct therein); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1113 (N.D. Cal. 2008) (granting plaintiffs leave to amend complaint to enhance specific facts).

in oral argument and elsewhere, as to the actual proceedings at 3GPP related to the creation of Band 17. The amended complaint will attempt to remedy what we believe to be that misapprehension of the facts.

The heart of this antitrust claim is the allegation that the interference justifications offered by the Defendants to explain the creation of Band 17 were simply not true. The Complaint alleges that the claims of interference were false as a matter of science and engineering. That is a fact that Cellular South contends must be accepted for purposes of this litigation.[2] Cellular South would never have filed this litigation if there really had been genuine interference that would have actually interfered with the utilization of Band 12 by carriers such as AT&T.

Because the Defendants have asserted no other reason for creating Band 17 other than interference – and because the claim that "interference" required the creation of Band 17 is demonstrably false as a matter of science – Cellular South alleges that the **only plausible reason** for the creation of Band 17 was to create a private ecosystem for AT&T, with all of the anticompetitive effects outlined in the original complaint. The complaint alleged that, because those interference claims are demonstrably false, they were a mere pretext to allow creation of a private ecosystem for AT&T for anticompetitive purposes.

The Court's Memorandum Opinion does not directly address this critical issue of whether the claims of interference were true or false. Instead, the Court stated:

---

[2] The proposed amended complaint will allege additional facts that have come to light since the original complaint was filed that demonstrate that this fact is not only plausible but virtually indisputable. They include the fact that that Qualcomm has since determined to make a chip for Band 12 and U.S. Cellular is actually using (a limited number of ) Band 12 devices. It is virtually impossible to reconcile those facts with the contentions advanced at 3GPP to justify the creation of Band 17. Moreover, the FCC has already made it clear that most of the interference concerns offered to 3GPP have no merit and is seriously considering whether any interference concerns justify the separation of Band 17 from Band 12. Again, those facts show that at least some of the contentions advanced at 3GPP were frivolous, suggesting a lack of intellectual honesty by those that presented them to 3GPP.

> Unlike <u>Allied Tube</u>, which involved a standard setting process that was biased through the use of improper and unfair practices and procedures, see <u>Clamp-All Corp. v. Cast Iron Soil Pipe Institute</u>, 851 F.2d 478, 488 (1st Cir. 1988) (Breyer, J.) (discussing <u>Allied Tube</u>), in this case *sub judice*, the Defendants' conduct during the 3GPP process in 2008 is, on its face, lawful. While Plaintiffs argue that Defendants' technical justifications set forth during the 3GPP process are merely pretext for anticompetitive behavior, the 3GPP process was followed to the letter. That is, there are no facts demonstrating procedural irregularities within the process, that the 3GPP process was subverted or turned into a sham, or that the Defendants agreed to employ—or indeed did employ—any improper practices within the standard setting process. The highly complex and technical arguments in favor of creating Band Class 17 were set out in writing for evaluation by experts, and the concerns relating to such creation of Band Class 17 were duly contemplated at 3GPP meetings. The 3GPP acted by a consensus as it relates to the creation of Band Class 17, and there was no objection from any person or entity, including the Plaintiffs and Verizon Wireless, who also holds spectrum licenses in the Lower A Block. (Memorandum Opinion at 21.)

In short, the Court found that the action of 3GPP made it "implausible" under the *Twombly* standard that the interference claim was false. "Plaintiffs have not alleged plausible facts demonstrating that the 3GPP standard setting process was biased or otherwise subverted." (Memorandum Opinion, at 22.)

With all respect, the Defendants' vague descriptions of 3GPP led the Court to rely far more on the approval of Band 17 than is supported by the facts. The Court deferred to 3GPP even though the actual facts, to be shown in the amended complaint, make it clear that *Allied Tube* and *Clamp-All* required a different result.

Plaintiffs agree that 3GPP followed its own rules "to the letter." However, the amended complaint will more clearly state the facts that present the more fundamental question that determined the outcome in *Allied Tube*. As made clear by then-Judge Breyer in *Clamp-All*, the fundamental question for antitrust analysis is not "with the letter" compliance with the rules of the standard setting organization:

*See Indian Head, Inc. v. Allied Tube & Conduit Corp.,* 817 F.2d 938 (2nd Cir.) (antitrust claim stated where defendant conspired with other steel companies to block the approval of plaintiff's product by a national certifying organization**; defendant acted within the letter of the organization's rules, but violated their spirit** by paying for and packing a meeting with voters who had little to no professional interest in the subject matter), *aff'd,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988).

*Allied Tube* dealt with the National Fire Association – a body in which the steel conduit manufacturers were able to obtain a small majority by taking legal efforts to "turn out the vote." *Allied Tube* involved a decision by the standards setting body whose "process was followed to the letter." That action – like that of 3GPP – was, on its face, lawful. There was nothing improper in the conduct of the proponents of steel conduit – who did nothing more than make sure that the steel supporters, all legitimate members of the Association, turned out and voted.

The problem in *Allied Tube* was not the "turn out the vote" effort – which was perfectly permissible under the rules. Instead, the problem in *Allied Tube* was that the facts raised a real concern that the decision that "polyvinylchloride conduit is unsafe" was not the result of science or good judgment. Instead, that result was achieved legally by use of the greater voting power of the steel conduit manufacturers.

Thus, the steel conduit manufacturers seeking to exclude polyvinyl chloride conduit "acted within the letter of the organization's rules." However, *Allied Tube* held that a standard-setting organization – **even if it follows the rules** – cannot adopt standards to exclude competitors based on pretextual concerns **that favored the majority**. As noted in *Allied Tube*:

> That rounding up supporters is an acceptable and constitutionally protected method of influencing elections **does not mean that rounding up economically interested persons to set private standards must also be protected**.

6

*Allied Tube* went on to say:

> **The antitrust validity of these efforts is not established, without more, by petitioner's literal compliance with the rules of the Association, for the hope of procompetitive benefits depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition.**

The process followed by the steel-favoring members of the National Fire Association – even though they followed the rules of the Association to the letter – provided no assurance that there had been unbiased consideration of the actual merits of the claim that polyvinyl chloride conduit was safe. As the Supreme Court stated:

> What petitioner may not do (without exposing itself to possible antitrust liability for direct injuries) is bias the process by, as in this case, stacking the private standard-setting body with decisionmakers sharing their economic interest in restraining competition.

Thus, the fact that 3GPP followed its own procedures to the letter **<u>does not end the inquiry</u>**. **The problem is that the 3GPP deck was stacked.** In *Allied Tube,* the steel conduit manufacturers had a legitimate majority. RAN 4 was far worse, since it **included no members who had a substantial economic interest in resisting AT&T's efforts to restrain competition.** *Allied Tube* teaches that decisions on issues of science made by private bodies stacked in favor of one result are not entitled to deference.

The Second Amended and Supplemental Complaint will discuss the facts showing the "stacked deck" in more detail, but the primary facts include the following:

1. Bands used by wireless carriers vary from country to country. RAN 4 is an international body. The overwhelming majority of the persons attending the meeting of the RAN 4 Working Group had no interest in matters related to the band structure in the Lower 700 MHz spectrum in the United States, and had no knowledge about alleged interference involving Band 12.

2. The general practice at 3GPP, and RAN 4 in particular, is that local and limited issues – such as the delineation of bands for use in a particular country – are resolved by those who have an interest in the matter. As a general rule and certainly in matters related to

7

the creation of Band 17 as recorded by the minutes of its proceedings, representatives of companies that have no direct interest in an item under discussion do not participate to any substantive extent in that item.

3. Hundreds of persons attend meetings of RAN 4, but it is clear that members of RAN 4 cannot and do not consider every issue. The meeting reports for the RAN 4 Working Group meetings for the months at which Band 17 discussed demonstrate that no participants could have reasonably considered all of the issues presented – simply because of the complexity as well as sheer volume of documents that were considered. For example, more than a thousand submissions related to various proposals were submitted, discussed, and reviewed for each of the May, June and October 2008 meetings. Many, and perhaps most, of those submissions involved very complicated technical matters. Likewise, at each of those meetings, hundreds if not thousands of separate issues were discussed, and more than 100 change requests were considered and adopted to existing standards.

4. In addition, because not every participant expects to review every action taken at RAN 4, many participants do not devote full time to RAN 4 meetings, since many attendees try to attend multiple RAN meetings to deal with other issues in which their company has an interest when they are held in the same city.

5. Almost all of the relatively large number of persons may attend any particular meetings of the RAN 4 Working Group are there to deal with interests that affect their own countries and interests. For example, during the April, 2008 meeting of the RAN 4 Working Group of 3GPP, there were more than 300 attendees from all over the world. But there were few that had any interest in Band 17. Most of the attendees had no interest whatsoever in the outcome of the Band 17 determination in the United States. For example, the attendee list for the April, 2008 RAN 4 meeting indicates that there were eight participants from China Mobile Communication Corporation, the Chinese wireless carrier, who had absolutely no interest whatsoever in the outcome of the Band 17 determination in the United States and, consequently, deferred to the leadership and to others who had an interest in that subject.

6. In short, and contrary to the suggestions of the Defendants, the 3GPP reports make it clear that the interference claims were not duly considered by any group of disinterested experts at RAN 4 and 3GPP. Instead, those issues were considered only by a very few people whose companies had an interest in the creation of Band 17.

7. 3GPP works like many other similar organizations with large numbers of members with very different economic interests. Members who have no interest in an issue allow those who have an interest in that issue, even if they are a small minority, to make the determination. That is almost a necessity for a group with hundreds of members that has to deal with a very large number of different items every month, since it is impractical for every attendee to give attention to every issue on the agenda. Moreover, that is a practical necessity because businesses, as a general rule, do not spend money and resources studying matters in which they have no interest – such as band structures in

countries in which they do not operate or interference on spectrum in which they have no licenses. Finally, there is the practical point that here is no benefit in objecting to matters urged by another member of 3GPP unless there is a need to do so, since that might lead to a reciprocal objection on some other matter. For that reason, the overwhelming majority of the members of the RAN 4 Working Group, the RAN Technical Specification Group, and 3GPP would have, and did, simply acquiesce in the proposal of just a few.

8. Of course, it follows that companies with no interest in the outcome do not conduct research or analysis on such matters.

9. Consequently, there is no evidence in the 3GPP record that there was any analysis by any company or expert that supported the technical conclusions of AT&T, Motorola and Qualcomm with respect to the interference concerns related to Band 12 were correct. Indeed, all of the evidence is to the contrary.

10. The only three parties who supported the existence of interference as a basis to create what was to become Band 17 were AT&T, Qualcomm, and Motorola.

11. The latter two companies had substantial financial incentives to support AT&T's claims – since they would share in the enhanced profits of eliminating AT&T's competitors as preferred vendors of ATT, for all of the reasons outlined in the original complaint.

12. The claims of interference as justification for creation of Band 17 were not supported by any parties other than the Defendants.

13. Moreover, the records of 3GPP make it clear that there is absolutely no reason to believe that any other attendee agreed with the claims of interference submitted by the Defendants.

14. Ericsson, the only other entity whose representative offered any substantive analysis on the issue, as recorded in the proceedings of the RAN 4 Working Group of 3GPP, criticized the claims of interference and initially opposed the proposal for the reasons outlined in the complaint. Not only did Ericsson warn that the introduction of Band 17 "goes against economies of scales and may lead to market fragmentation," Ericsson also addressed and refuted the interference scenarios posited by Motorola in support of Band 17. For instance, in its submission refuting the necessity of Band 17, Ericsson concluded that out of band emissions (OOBE), one the reasons cited by Motorola for Band 17, "is thus not relevant for the Band 15 issue" because it only affects Lower A Block licensees and would not be alleviated by the creation of Band 17. Next, Ericsson analyzed receiver blocking of the Lower A and B block base stations by Channel 51 transmissions, calculated the effects of such blocking, and concluded that "this can easily be achieved with an external filter for LTE sites close to the broadcast tower and is not a major reason for introducing a Band 15 duplexer." As to receiver blocking of the Lower C block base stations by Lower D and E Block transmissions, Ericsson concluded that the degradation would be minimal and that "Band 15 instead of Band 12 would have a very limited effect

here." Next, Ericsson addressed the alleged interference from Lower D and E Blocks into device receivers in Lower A, B, and C blocks, performed the calculations for the degradation which in theory would result, concluded that the degradation in Lower B Block would be minimal, and summarized that "it is questionable if a Band 15 duplexer should be introduced based on the coexistence results considered above." Finally, Ericsson addressed the existence of reverse power amplifier intermodulation from Channel 51, stated that the actual reduction of that intermodulation from a Band 17 as opposed to a Band 12 filter was unknown, and concluded that "only scenario that motivates a band 15 duplexer is the 10 MHZ LTE allocation in B+C for terminals used in the vicinity of broadcast transmitters." In short, the only party that made a comment on the interference disagreed with the interference claims.

15. Finally, the minutes of 3GPP reflect that Ericsson stated that it desired to consult with holders of Band 12 spectrum licenses. Ericsson did not consult with Cellular South, one of the primary holders of Band 12 spectrum licenses, and there is no indication in the 3GPP minutes that the Vice Chairman of RAN 4 Working Group, Motorola, permitted that request. Ericsson finally acquiesced in the creation of Band 17 – but did not state that it agreed with the interference claims made by the Defendants. Ericsson has now become a very substantial supplier of 4G-LTE base station equipment to AT&T.

16. The relevant portions of the minutes of the RAN 4 proceedings, to be attached to the amended complaint, show the very limited extent of discussions held on this issue. Rather than a full-fledged debate about the merits of the interference concerns, the 3GPP minutes reflect that there were only comments from two participants other than the Defendants and Ericsson.

17. Nortel, an equipment manufacturer, in response to a comment that the interference concerns to device receivers from Lower D and E Block base stations may be alleviated by filtering at the base station, said that base station "filtering can be improved." That suggests that Nortel believed that at least one of the alleged interference concerns would be solved by improved filtering at the base station.

18. The only other reported comment offered by any participant in the process was not substantive, consisting of a suggestion from T-Mobile that any new band should be named "Band 17" rather than "Band 15" to avoid confusion with the existing Band 15.

19. Even those carriers operating in the United States that did not own spectrum in the Lower A Block would have no interest in devoting the engineering resources and time to consider and analyze the claim of interference. To such companies, this matter was of absolutely no interest or concern.

20. The record at 3GPP does not indicate that Verizon took any action one way or the other on the creation of Band 17. There is no evidence that Verizon analyzed or even considered the claimed interference. Verizon had no reason to oppose the creation of Band 17. Verizon's interests arising out of its ownership of Lower 700 MHz spectrum were not injured by the creation of Band 17. Verizon suffered no injury from the creation

10

of a separate ecosystem for AT&T, since Verizon had sufficient size and scale that it would have no difficulty in causing manufacturers of devices and chips to provide devices designed to operate on all of Verizon's spectrum, including Band 13 and any portion of the Lower A spectrum that it chose to build out. Verizon also was not injured by the balkanization of roaming, since Verizon owned a nationwide system of Band 13 spectrum on which Verizon was engaged in deploying a nationwide network, and didn't need to roam on AT&T's spectrum, or its newly created Band 17.

21. There were no objections by Cellular South or any of the other Lower A Block licensees (other than AT&T and Verizon) for one simple reason – none of them were party to any of the 3GPP proceedings related to the creation of Band 17.

22. Cellular South had no notice of the intended creation of Band 17. Based on conversations with Lower A Block licensees other than AT&T and Verizon after the creation of Band 17, Cellular South believes, and alleges on information and belief, those licensees were not aware of the proposal to create Band 17 before it was actually accomplished, and were as shocked as Cellular South to learn that it had been accomplished by 3GPP without their knowledge or input. Cellular South is not aware of any notice given in any fashion that would have alerted those license holders of the proposal.

23. According to the published list of 3GPP attendees, none of the other owners of Lower A Block spectrum (other than Verizon) attended the 3GPP meetings related to the creation of Band 17.

24. Prior to the creation of Band 17, Cellular South (like other smaller carriers) did not participate in the actions of 3GPP because Cellular South believed that such participation was unnecessary. 3GPP meetings are discussions of engineers about technical matters that are held around the world on almost a monthly basis. The cost of membership, paying an employee for monthly international travel, and the other costs associated with 3GPP participation would have been very high. Additionally, a condition of membership in 3GPP is the ability and willingness to make a meaningful contribution to the technical work of 3GPP. Thus membership, even if theoretically more open, consists of large carriers and supplies to the industry, all of whom have large engineering staffs who can in fact make a contribution. It is neither desirable nor desired by 3GPP that every person in the wireless business gather around the world on a monthly basis just to see what might happen. Cellular South's engineering staff was devoted to deploying existing technology provided by suppliers – and not the development of new technology. Cellular South, even if technically eligible for membership, lacked the engineering staff to make any meaningful contribution – and has relied upon outside experts for matters related to the claimed interference. Cellular South saw no reason to attend since it did not have an engineering staff sufficient to devote the time to make meaningful contributions to the technical engineering matters discussed at 3GPP.

25. Had Cellular South known about the proposal to create Band 17, Cellular South could have joined 3GPP, could have hired experts to study and rebut the interference claim, and

11

could have otherwise objected to the proposal. However, without such advance knowledge of an unprecedented action by 3GPP, Cellular South had no reason to hire experts to attend international meetings "just in case" the international body should take the unprecedented action of fragmenting an existing band.

26. Cellular South never anticipated – and on information and belief no holder of Lower A Block spectrum (other than AT&T and Verizon) ever anticipated – that 3GPP would carve out spectrum from a previously established band. Such an action to reduce the spectrum in a band has, upon information and belief, never been taken by 3GPP before or since. In fact, such action is contrary to 3GPP's stated purpose of increasing of increasing interoperability and efficiency, and promoting competition.

27. AT&T, Qualcomm and Motorola chose not to consult with Cellular South or other licensees of Lower A Block spectrum or advise them of the proposal to fragment Band 12, even though they knew of its anticompetitive effect.

28. In fact, in the RAN 4 Working Group Meeting Report in May, 2008 just after it proposed the creation of Band 17, Motorola commented: "**we need to understand what is the impact on block A**, they agree. The assumption is that block B and C will be located in channel 51, **block A need some feedbacks from the operators**." Further, the meeting report stated that the conclusion was "[n]eed feedbacks [sic] from operators."

29. Thus, even though Motorola and RAN 4 itself acknowledged that feedback from the Lower A Block operators was needed, no action was taken to get that feedback. Based on information and belief, no Lower A Block operator (other than possibly Verizon, who had no interest in the matter) was ever contacted.

30. This failure to consult with the lower Lower A Block operators was an intentional omission of a step that Motorola had acknowledged to be necessary. The failure to seek that feedback, or provide notice of any kind, strongly suggests an intent to proceed in the willful absence of that feedback. If this matter had been "purely interference" Qualcomm and Motorola would have consulted with those entities in an effort to explain the proposal and seek methods of remediating the problems that they no doubt anticipated.

31. Cellular South and other Lower A Block licensees should not be faulted for failing to anticipate that anticompetitive conduct and fighting it by sending engineers and interference experts around the world on a monthly basis to deal with such an unprecedented issue should such an issue arise, particularly when the Defendants knew that their views were important to the process and chose not to even notify them of the issue.

In sum, 3GPP is dominated by the large carriers operating in the United States and the device and equipment manufacturers and others who, directly or indirectly, sell most of their

wares to those carriers. At 3GPP, the other entities represented at RAN 4 simply deferred to AT&T, Qualcomm and Motorola. AT&T, Qualcomm and Motorola chose not to seek feedback from the smaller carriers, even after recognizing that was a necessary step. That conduct may have been "legal" – in the sense that it did not deviate from the procedural requirements of 3GPP – but it suffered from the same lack of fairness as found in *Allied Tube*.

The Lower A Block licensees – the entities directly affected by the creation of Band 17 – were not members of 3GPP for the good reasons noted above. Their views on the creation of Band 17 were not invited, and indeed they knew nothing of the proposal to fragment Band 12. A result obtained from that procedure is entitled to no more than deference than the National Fire Association was provided in *Allied Tube*:

> Few of the steel group voters had any of the technical documentation necessary to follow the meeting. None of them spoke at the meeting to give their reasons for opposing the proposal to approve polyvinyl chloride conduit.

Thus, the problem in *Allied Tube* was not the tactic of "getting out the vote." The vote against polyvinyl chloride was not a "sham" proceeding. **All of the proceedings of the National Fire Association were equally as "legal" as the actions of the 3GPP. The problem in *Allied Tube* was that the end result was influenced by anticompetitive motives of those who controlled the association, rather than by the actual merits.**

That same problem is present here. Indeed, the 3GPP's decision to create Band 17 is even less worthy of deference than in *Allied Tube* – because at least the National Fire Association conducted a full and open debate in which all parties could participate. Here, AT&T took advantage of an existing forum at which its friends were present and in control – just as the steel conduit proponents took advantage of their majority in the National Fire Association. The decision of 3GPP is not entitled to deference because the Lower A Block licensees (other than

Verizon, which had no interest in the issue) were not represented at all. Even after noting that the views of the carriers should be solicited, none of the 3GPP members notified them about the proposed change to their existing band.

Under those circumstances, it is no surprise that 3GPP reached the result urged by AT&T. Indeed, one would fully expect that the few members who took any notice of the action to create Band 17 at RAN 4 or 3GPP would have approved if no one protested. The proceeding of 3GPP – while technically legal – was not in the spirit of a standards setting body that attempts to resolve issues fairly and on the merits, rather than to provide a competitive advantage to a member. Certainly, it is not a decision upon which this Court can rely in finding implausible the claim that the interference arguments were false.

The fact that Qualcomm and Motorola chose not to notify the Lower A Block licenses is of telling. If concerns about interference had been the real issue, Qualcomm and Motorola would have consulted with carriers other than AT&T. Qualcomm and Motorola knew that the Lower A Block licensees planned to deploy networks on Band 12. They knew that the Lower A Block licensees had spent a fortune on the Lower A Block spectrum. (Cellular South itself had spent nearly $200 million.) Qualcomm and Motorola knew – even before Ericsson pointed it out in opposition to the proposal – that creating Band 17 would create issues by fragmenting the spectrum and reducing efficiencies. They knew that the decision would adversely impact the Lower A Block licensees. Indeed, the minutes of 3GPP make it clear that the realized that feedback should be sought from the owners of the Lower A Block licensees. The 3GPP minutes also indicate that Ericsson "ask[ed] to discuss this [Change Request] in the next meting [sic] with the band 12," which indicated that Ericsson and the Defendants knew that Band 12 carriers

would be impacted by the decision. But instead they chose to proceed at 3GPP without providing them any notice or advance consultation.

The identity of the carriers who had purchased the Lower A Block spectrum were known to the Defendants. The names and addresses of all licensees of Lower A Block spectrum could easily have been determined from many sources, including the records of the Federal Communications Commission.

The decision by RAN 4 is not entitled to any deference by a Court applying the antitrust laws of the United States. **This falls within the test enunciated in *Allied Tube*: The Defendants may have "acted within the letter of the organization's rules, but violated their spirit."**

There is no statutory or other antitrust exemption for actions of 3GPP.[3] Thus, the question here is whether the decision of 3GPP makes it implausible that anticompetitive motives were at work. Given the limited involvement of the participants and the fact only one side was present for the debate, it is far more plausible that the 3GPP decision reflects anticompetitive conduct – rather than a disinterested decision about interference. While there may be good reasons to assume the plausibility of decisions made by standards setting bodies in appropriate cases are not made for anticompetitive purposes, those reasons cease to exist the parties who are interested in the issue are not members and are not provided any notice of the meeting.

While failing to follow the rules can be enough to look behind the decision of a standards setting organization, *e.g., Trueposition*, *supra, Allied Tube* and *Clamp-All* make it clear, that merely following the rules does not put an end to the inquiry**.** Even if the rules are followed to

---

[3] As made clear by *Allied Tube*, the *Noerr-Pennington* rule does not apply to the actions of the 3GPP since it is a non-governmental body, so questions relating to the standards for finding "sham" proceedings are not relevant.

the letter, other factors – as in *Allied Tube* – make it clear that such a decision need not be honored if it is the result of anticompetitive pressure rather than science. There is no reason for a federal court to hold that a decision in which only one side takes part is determinative of the plausibility of any technical decision.

That must be the law. Any decision that "following the procedural rules 'to the letter' makes any technical decision of a standards setting organization so plausible that it must be accepted" would vitiate the antitrust laws. Such a rule would encourage large companies (such as AT&T) to use those bodies to influence the competitive landscape by marginalizing small competitors. Such a rule would immunize virtually any decision by innumerable standards setting bodes that impacts their smaller competitors – and go far beyond any antitrust decision to date. Thus, *Allied Tube* sets a far different standard than just following the rules, because

> the hope of procompetitive benefits depends upon **the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition.**

Here, as in *Allied Tube*, there were **no such safeguards** – not even some attempt to make sure that RAN 4 considered both sides of the issue. There was no input from the Lower A Block licensees whose interests were adverse to AT&T. No one else present had any interest in fighting AT&T's proposal. All of that, individually and together, makes the existence of bias in the decision not merely plausible but almost inevitable.

The antitrust laws would be far too tightly construed by any ruling that makes any technical; decision of a standards setting organization dispositive when both sides of the issue are not present to present their views. 3GPP may have followed its own rules. However, this Court should not consider that action determinative of the interference issue because it was made without notice to or participation by the "other side." The **spirit** of 3GPP should, at least,

include a desire to consider all sides of a technical issue. In the circumstances where that principle was not followed, this Court should not find the technical decision to create Band 17 to be determinative of the claim that interference issues justified creation of Band 17.

## CONCLUSION

The Court should grant Cellular South until September 30 to file a motion to amend its complaint. At that time the legal sufficiency of the facts set forth in the amended complaint can be considered in an appropriate manner. The decision to allow a motion to amend should not be made in the context of this motion for additional time.

September 18, 2012    Respectfully submitted,


s/ Walter H. Boone_____
Alan W. Perry, MSB #4127
Daniel J. Mulholland, MSB #3643
Walter H. Boone, MSB #8651
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
City Centre, Suite 200
200 South Lamar Street
Jackson, Mississippi 39201
Tel.: 601-969-7833
Fax: 601-960-8613
aperry@fpwk.com

Charles L. McBride, Jr., MSB #8995
M. Patrick McDowell, MSB # 9746
Joseph A. Sclafani, MSB #99670
Brian C. Kimball, MSB #100787
Katie L. Wallace, MSB #101919
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
The Pinnacle Building, Suite 100
190 East Capitol Street
Jackson, Mississippi 39201
Tel.: 601-960-6891
Fax: 601-960-6902
cmcbride@brunini.com

        Walter T. Johnson, MSB#8712
        WATKINS & EAGER PLLC
        400 East Capitol Street, Suite 300 (39201)
        P. O. Box 650
        Jackson, MS 39205
        Phone: 601-965-1900
        Fax: 601- 965-1901
        wjohnson@watkinseager.com

*Counsel for Plaintiffs Cellular South, Inc., Corr Wireless Communications, L.L.C. and Cellular South Licenses, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2012, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

***Attorneys for Defendants AT&T Mobility LLC, and AT&T, Inc.***

David W. Upchurch
HOLLAND RAY UPCHURCH AND HILLEN
P.O. Drawer 409
Tupelo, MS 38802-0409
dwu@hruhpa.com

Michael K. Kellogg (PHV)
William J. Rinner (PHV)
Kenneth M. Fetterman (PHV)
Aaron M. Panner (PHV)
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL P.L.L.C.
1615 M. Street NW, Suite 400
Washington, D.C. 20036
mkellogg@khhte.com
wrinner@khhte.com
kfetterman@khhte.com
apanner@khhte.com

***Attorneys for Defendant Qualcomm Incorporated***

Sandy Sams
Margaret Sams Gratz
Otis R. Tims
MITCHELL MCNUTT & SAMS, P.A.
P.O. Box 7120
Tupelo, MS 38802
ssams@mitchellmcnutt.com
mgratz@mitchellmcnutt.com
otims@mitchellmcnutt.com

Yonatan Even (PHV)
Roger G. Brooks (PHV)
Carrie R. Bierman (PHV)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 8th Avenue
New York, New York 10019
yeven@cravath.com
rgbrooks@cravath.com
cbierman@cravath.com


***Attorneys for Defendant Motorola Mobility, Inc.***

Jim M. Greenlee
James D. Johnson
HOLCOMB, DUNBAR, WATTS, BEST, MASTERS & GOLMON
400 S. Lamar, Ste. A
P.O. Drawer 707
Oxford, MS 38655
jgreenlee@holcombdunbar.com
jdjohnson@holcombdunbar.com

John S. Gibson (PHV)
Chahira Solh (PHV)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
jgibson@crowell.com
csolh@crowell.com

Jason C. Murray (PHV)
Crowell & Moring LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
jmurray@crowell.com


THIS, the 18th day of September, 2012.


                                                                  /s/ Walter H. Boone_____