# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

|  |  |  |
|---|---|---|
| CORR WIRELESS COMMUNICATIONS, L.L.C., | ) | |
| CELLULAR SOUTH, INC., AND | ) | |
| CELLULAR SOUTH LICENSES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:12-cv-036-SA-SAA |
| | ) | |
| AT&T INC., AT&T MOBILITY LLC, | ) | |
| MOTOROLA SOLUTIONS, INC., AND | ) | |
| QUALCOMM INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AT&T MOBILITY LLC'S REPLY MEMORANDUM
## IN SUPPORT OF ITS MOTION TO DISMISS
## <u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .......................................................................................................................... 2

I.  PLAINTIFFS' CONCESSIONS THAT THE 3GPP PROCESS WAS FOLLOWED
    AND THAT DEFENDANTS DID NOT ENGAGE IN ANY IMPROPER CONDUCT
    IN THAT PROCESS FORECLOSE THEIR CLAIMS.................................................... 3

    A.  Plaintiffs' Allegation that the Band 17 Standard Was Unjustified as a Technical
        Matter Does Not Provide the Basis for Any Antitrust Claim ................................. 3

    B.  Plaintiffs Fail To Allege Any Improper Conduct by Defendants or Any
        Departure from Appropriate 3GPP Procedures ....................................................... 5

II. PLAINTIFFS FAIL TO PROVIDE ANY PLAUSIBLE FACTS TO SUPPORT THE
    INFERENCE THAT DEFENDANTS UNLAWFULLY CONSPIRED.......................... 10

III. THE TASC ALLEGES NOTHING NEW IN SUPPORT OF PLAINTIFFS'
    REMAINING CLAIMS AND THEY HAVE PROVIDED NO BASIS FOR THIS
    COURT TO RECONSIDER ITS PRIOR ORDER OF DISMISSAL ............................ 14

CONCLUSION..................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**          **Page**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)...................................................................................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................13, 14

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
157 F.3d 1340 (Fed. Cir. 1998).................................................................5

*Caldera, Inc. v. Microsoft Corp.*,
72 F. Supp. 2d 1295 (D. Utah 1999).........................................................5

*City of Moundridge v. Exxon Mobil Corp.*,
250 F.R.D. 1 (D.D.C. 2008)..................................................................11, 12

*Consolidated Metal Prods., Inc. v. American Petroleum Inst.*,
846 F.2d 284 (5th Cir. 1988) ................................................................1, 3

*DeLong Equip. Co. v. Washington Mills Abrasive Co.*,
887 F.2d 1499 (11th Cir. 1989) ..............................................................13

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986) ................................................................12

*Fragale & Sons Beverage Co. v. Dill*,
760 F.2d 469 (3d Cir. 1985)...........................................................11, 12, 13

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
547 F.3d 266 (5th Cir. 2008) ..............................................................1, 3, 4

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*,
128 F.3d 59 (2d Cir. 1997).......................................................................12

*High Tech. Careers v. San Jose Mercury News*,
996 F.2d 987 (9th Cir. 1993) ...................................................................12

*Linerboard Antitrust Litig., In re*,
504 F. Supp. 2d 38 (E.D. Pa. 2007) ....................................................12, 13

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)..................................................................................5

*Rosenblatt v. United Way of Greater Houston*,
    607 F.3d 413 (5th Cir. 2010) ............................................................................14

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998)...............................................................11, 12, 13

*TFT-LCD (Flat Panel) Antitrust Litig., In re*,
    586 F. Supp. 2d 1109 (N.D. Cal 2008) ...........................................................12

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
    C.A. No. 11-4574, 2012 WL 3584626 (E.D. Pa. Aug. 21, 2012)...................6, 7

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..........................................................................................5

*Whipple v. Favorite*,
    Civ. A. No. H-07-3923, 2009 WL 3255262 (S.D. Tex. Sept. 29, 2009) ..........13

**OTHER AUTHORITIES**

Alan Devlin & Michael Jacobs, *Anticompetitive Innovation and the Quality of
    Invention*, 27 Berkeley Tech. L.J. 1 (2012) ........................................................5

Keith N. Hylton & Michael Salinger, *Tying Law and Policy: A Decision-Theoretic
    Approach*, 69 Antitrust L.J. 469 (2001)..............................................................5

## PRELIMINARY STATEMENT

This Court correctly ruled that Cellular South's First Amended Complaint failed to state a claim under Section 1 or Section 2 of the Sherman Act because it did not allege facts to support an inference that the adoption of Band 17 standards by 3GPP was the product of an unlawful agreement among the Defendants to subvert the 3GPP standard-setting process. As AT&T Mobility has explained, the Third Amended and Supplemental Complaint ("TASC") fails to state a claim for the same basic reason. Cellular South argues in opposition that it has stated a claim based on allegations that (1) the creation of Band 17 was not "required" by the interference concerns accurately identified by participants in the 3GPP; and (2) the 3GPP process did not sufficiently protect the interests of absent industry participants.

Plaintiffs' arguments provide no reason for this Court to revisit its earlier ruling. Binding authority from the Fifth Circuit makes clear that a plaintiff cannot pursue an antitrust claim simply by alleging that an industry standard is unnecessarily restrictive of competition in the absence of allegations that defendants wrongfully hijacked a standard-setting process through improper means. *See Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008); *Consolidated Metal Prods., Inc. v. American Petroleum Inst.*, 846 F.2d 284 (5th Cir. 1988). Plaintiffs repeatedly concede that the 3GPP "follow[ed] its own rules," Combined Mem. Br. in Resp. to Defs.' Second Mot. to Dismiss at 26 (ECF No. 150, Apr. 3, 2013) (hereinafter "Opp.") – which ensure open consideration of technical issues and decision-making by consensus – and they never allege that Defendants presented any falsified technical data to 3GPP, arguing only that documented interference concerns "were insufficient to *require* the creation of Band 17," *id*. at 7 (emphasis added). Those concessions should be fatal to the effort to challenge the Band 17 standard as an unlawful restraint of trade.

Furthermore, Plaintiffs cannot overcome – and for that reason ignore – the basic contradiction underlying their assertion that the conduct at issue was the result of an unlawful conspiracy. Plaintiffs assert that Motorola's decision to propose Band 17 and Qualcomm's decision to support it must have been the product of agreement with AT&T Mobility because the "fragment[ation of] the Lower 700 MHz" would "reduc[e] . . . economies of scale," to suppliers' detriment. Opp. 42-43. But if the creation of Band 17 was contrary to the interest of device-manufacturer Motorola and chip-supplier Qualcomm, it would also have been contrary to the interest of the dozens of other device and equipment manufacturers who participate in 3GPP (at least two of which – Ericsson and Nortel – commented on the proposal). This provides an independent reason to conclude that the concession that the 3GPP process was followed renders Plaintiffs' conspiracy theory implausible. In the admitted absence of any direct factual allegation that Defendants reached an unlawful agreement, Plaintiffs bear the burden of establishing that the inference of conspiracy that they seek to draw is plausible. They have failed to meet that burden.

## ARGUMENT

Plaintiffs argue that this Court's Memorandum Opinion "in essence rejected without directly addressing Cellular South's allegations that interference justifications submitted by Defendants were pretextual." Opp. 21. But this Court properly recognized that Plaintiffs' assertion that there was insufficient technical justification for the establishment of Band 17 (which, as every version of this complaint makes clear, is all Plaintiffs mean by calling it "pretextual") did not provide any basis for Cellular South's antitrust claims. *See* Memorandum Opinion at 21-22 (ECF No. 100, Aug. 31, 2012) (hereinafter "Mem. Op."). As discussed in Point I below, Plaintiffs did not – and do not – allege that there was any impropriety rendering

the standard-setting activity of 3GPP and Defendants' role in that process potentially subject to antitrust attack. As discussed in Point II, moreover, Plaintiffs' argument that Motorola and Qualcomm would not have supported a "pretextual" standard absent agreement cannot provide a basis for an inference of agreement when the many other equipment manufacturers that participated in the 3GPP process also agreed to the adoption of the Band 17 standard.

For both of these reasons, Plaintiffs' admission that the 3GPP process was followed "to the letter" forecloses their antitrust claims.

I.  **PLAINTIFFS' CONCESSIONS THAT THE 3GPP PROCESS WAS FOLLOWED AND THAT DEFENDANTS DID NOT ENGAGE IN ANY IMPROPER CONDUCT IN THAT PROCESS FORECLOSE THEIR CLAIMS**

    A.  **Plaintiffs' Allegation that the Band 17 Standard Was Unjustified as a Technical Matter Does Not Provide the Basis for Any Antitrust Claim**

Plaintiffs argue at length that Defendants' support for the adoption of Band 17 standards was "pretextual": they assert that, as a technical matter, the establishment of a new frequency band was not "*required* to deal with . . . interference," Opp. 17 (emphasis added), and that Defendants were motivated by the desire to place certain competitors of AT&T Mobility at a disadvantage. But Plaintiffs do *not* question the legal principle that such an assertion – even if adequately alleged – does not provide any basis for an antitrust challenge to standard-setting conduct. *Golden Bridge* and *Consolidated Metal Products* – along with many other cases cited in AT&T Mobility's Memorandum of Law – establish that a challenge to the technical merits of a standard adopted through a legitimate standard-setting process provides no basis for a claim under the Sherman Act. *See* Def. AT&T Mobility LLC's Mem. of Law in Supp of its Mot. to Dismiss the Third Am. and Supplemental Compl. at 7-10 & nn.6 & 8 (ECF No. 137, Feb. 27, 2013) (hereinafter "AT&T Mobility Mem.").

Plaintiffs argue that their allegations are different from the facts in *Golden Bridge*, suggesting that in that case the standard at issue "'allow[ed] the numerous necessary components of cellular communications to operate compatibly,'" while the Band 17 standard creates "incompatibility." Opp. 27-28 (quoting *Golden Bridge*, 547 F.3d at 273). But 3GPP's Band 17 standard promotes compatibility in the same way as the standard at issue in *Golden Bridge*: by providing a common set of technical specifications that all manufacturers and suppliers can follow. That standard creates precisely the "procompetitive benefits" as the standard at issue in *Golden Bridge* and other cases by ensuring that suppliers of network equipment, end-user devices, and other complementary products can design to a common standard. And the fact that the creation of the Band 17 standard allegedly disfavors the interests of certain wireless carriers who would prefer that all carriers operating in the Lower 700 MHz spectrum be forced to operate on Band 12 likewise does nothing to set this case apart from every other case involving a challenge to an industry standard: by their nature, industry standards nearly always tend to promote certain products and disfavor others. That was true of the standard in *Golden Bridge*. Plaintiffs' insistence that their technical arguments are scientifically valid and that the adopted standard was improperly motivated makes this case no different from any other failed challenge to an industry standard.

Furthermore, there is a fundamental difference between the adoption of industry standards through a legitimate standard-setting process and alleged *unilateral* efforts by a monopolist to foreclose competition by deliberately making a monopoly product incompatible with existing complementary goods. For that reason, Plaintiffs' reliance (at 53-54) on cases

involving so-called "predatory innovation"[1] is unavailing. AT&T Mobility did not adopt any unilateral change to its products or services in such a way as to foreclose competition in complementary products: to the contrary, AT&T Mobility participated in an open standard-setting process designed to ensure that a common standard will promote competition and innovation throughout the supply chain.

### B. Plaintiffs Fail To Allege Any Improper Conduct by Defendants or Any Departure from Appropriate 3GPP Procedures

Plaintiffs effectively acknowledge that their technical challenge to the Band 17 standard is insufficient by arguing that the 3GPP process lacked "meaningful safeguards" to prevent the process from being hijacked for anticompetitive ends. Opp. 29-40. But nothing in Plaintiffs' arguments or in the TASC supports the claim either that Defendants engaged in any improper conduct or that the 3GPP process prevented due consideration of Band 17.

1. As this Court correctly observed, there were no facts alleged in the first amended complaint to indicate that any of the Defendants "agreed to employ – or indeed did employ – any improper practices within the standard setting process," Mem. Op. 21, and nothing in the TASC

---

[1] *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1382 (Fed. Cir. 1998); *Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1309 (D. Utah 1999). Both *C.R. Bard* and *Caldera* have been sharply criticized, *see* Alan Devlin & Michael Jacobs, *Anticompetitive Innovation and the Quality of Invention*, 27 Berkeley Tech. L.J. 1, 16-19 (2012) (calling *C.R. Bard* "[t]he single most ill-conceived treatment of predatory innovation"); Keith N. Hylton & Michael Salinger, *Tying Law and Policy: A Decision-Theoretic Approach*, 69 Antitrust L.J. 469, 484 (2001) (explaining that the "*Caldera* test threaten[s] to penalize some of the most desirable types of innovation" because it "places little emphasis on consumer benefits and a great emphasis on the 'validity and significance' of the technical improvement, using hindsight to judge"), and have been effectively overruled by *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009) and *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). *linkLine* and *Trinko* make clear that a monopolist generally has no obligation to deal with a competitor; in the absence of a duty to deal, complaints that a monopolist has failed to facilitate a potential competitors' business fail to state any claim under Section 2. In any event, whatever their continuing vigor, the "predatory innovation" cases have no application here.

or Plaintiffs' opposition supplies that deficiency. Plaintiffs argue that "the justifications purportedly requiring the creation of Band 17 were simply false," Opp. 15; *see also id.* 16; and that "AT&T perpetrated a falsehood on 3GPP and made false statements to 3GPP," *id.* 44, *see also id.* 48, but nothing in the complaint alleges that any Defendant ever presented falsified technical information to 3GPP. To the contrary, this fourth version of the complaint tells the same story as the initial version: Plaintiffs admit that the interference concerns identified by Defendants' engineers were real, *see* TASC ¶¶ 255, 257, but they argue that the creation of Band 17 was not an appropriate response to those concerns. Such an assertion does not resemble a claim that a defendant falsified *data* – which would be potentially relevant because participants might, depending on circumstances, be expected to rely on the accuracy of objective data in making their own evaluation of recommended standards. *Cf. TruePosition, Inc. v. LM Ericsson Tel. Co.*, C.A. No. 11-4574, 2012 WL 3584626, at *22 (E.D. Pa. Aug. 21, 2012) (allowing complaint to proceed where defendants, among many other things, allegedly submitted "false" simulation results "in an attempt to discredit" competing technology). Plaintiffs are attacking only the conclusion that Defendants drew from the data and advocated before 3GPP – a technical judgment that other participants were able to evaluate, to challenge, and to disagree with. Plaintiffs do not and cannot explain why Defendants' competitors would simply have deferred to Defendants' judgments in this circumstance, or why it would have made sense for Defendants to expect them to do so.

Plaintiffs likewise do not allege facts to support any conclusion that Defendants took improper advantage of positions of influence within 3GPP to prevent due consideration of the Band 17 question. Plaintiffs do not claim that their preferred option – rejecting a new Band 17 in favor of reliance on the existing Band 12 – was excluded from consideration; to the contrary,

6

they concede it was considered as an alternative. *See, e.g.*, Opp. 34 (discussing Ericsson's position). Plaintiffs do not contend that Defendants made late submissions, rushed a decision on the Band 17 issue, or somehow created artificial obstacles to the due consideration of alternatives. *Cf. TruePosition*, 2012 WL 3584626, at *22. While Plaintiffs argue that Defendants "dominated" 3GPP's consideration of the Band 17 issue, Opp. 32-33, they mean only that Defendants took an active role in the issue, not that they improperly discouraged – much less prevented – participation by anyone else. Plaintiffs merely contend that Defendants supported a standard by presenting data and technical arguments submitted for evaluation by experts. *See* Mem. Op. 21 (noting that "[t]he highly complex and technical arguments in favor of creating Band Class 17 were set out in writing for evaluation by experts"). That is exactly what every participant in a standard-setting body is expected to do.

      **2.**      Plaintiffs' argument that the 3GPP process allegedly lacked "meaningful safeguards" to prevent the process from being subverted for anticompetitive ends likewise has no factual support in the TASC. Plaintiffs continue to argue that *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492 (1988), provides the appropriate standard for evaluation of standard-setting activity, while ignoring this Court's correct determination that the conduct at issue in *Allied Tube* has no counterpart here. The defendants in *Allied Tube* conspired with competitors to pack a meeting to ensure adoption of a provision of a recommended electrical code irrespective of technical merit. *See* 486 U.S. at 497 (noting that defendant "conceded that it had conspired with [competitors] . . . to exclude respondent's product from the Code"). 3GPP is not susceptible to any such abuse: its proceedings are open, its agendas publicized, and its decisions are taken by consensus. Plaintiffs do not identify any supposed defect in those

procedures; to the contrary, they admit that in "some (perhaps most) cases, the technical decisions made by 3GPP . . . actually reflect a considered and fair judgment."  Opp. 32.

Plaintiffs' arguments about why such safeguards were inadequate in this case do nothing to support their effort to encourage the Court to second-guess the merits of 3GPP's technical judgment.  Plaintiffs assert that few of the hundreds of 3GPP participants actively participated in the consideration of the Band 17 issue (and those who did were not acting as "neutral scholars," Opp. 31).  But Plaintiffs concede that other participants – not just Defendants – actively participated in the deliberations concerning Band 17; and Plaintiffs cannot allege that other participants did not consider and approve of the proposals simply because they did not make any recorded comments during the course of those deliberations.  More fundamentally, every participant with an interest in selling devices or equipment for use on Band 12 or Band 17 would have an incentive to monitor the proposed standards and to register any concerns.  The issue was before the 3GPP for several months and was duly publicized.  *See* TASC ¶¶ 189-204, 257, 310. Nothing in 3GPP's rules or in Defendants' conduct would have prevented or discouraged 3GPP members from evaluating the Band 17 proposal.

In this regard, Ericsson's participation in this issue – far from supporting Plaintiffs – strongly supports the conclusion that the 3GPP process provided the meaningful safeguards that foreclose Plaintiffs' theory.  As Plaintiffs concede, Ericsson agreed to the adoption of Band 17, despite initial reservations.  Plaintiffs do not allege that there was any unlawful agreement between any Defendant and Ericsson.  Ericsson's conclusion that the Band 17 proposal should be adopted (or at least should not be opposed) makes Plaintiffs' conspiracy theory all-the-more implausible.  Similarly, Plaintiffs' effort (at 34-37) to concoct an explanation for Verizon's non-opposition to Band 17 piles up implausible speculations when the factual allegations in the

TASC plausibly support only one conclusion: that Verizon saw no valid technical reason to object to the adoption of Band 17. *See* Mem. Op. 21 (noting significance of Verizon Wireless's agreement to the standard).

The allegation that Motorola proposed seeking additional feedback from wireless operators but that Defendants did not obtain such input, *see* Opp. 37-38, renders the allegation that Motorola acted pursuant to a conspiratorial agreement more implausible – it would hardly make sense for a conspirator to register the need for feedback from a conspiracy's intended victims. In any event, the allegation does not open 3GPP's processes to attack, when any interested party was free to provide its views on the Band 17 proposal without being asked.

Cellular South itself was, as it admits, perfectly free to monitor and participate in 3GPP proceedings; its failure to do so makes its effort to blame the 3GPP process for an outcome with which it disagrees especially hollow. Cellular South insists that it was entitled to rely on the kindness of strangers participating in the 3GPP to protect its interests. Opp. 38-40. But the antitrust laws do not impose a duty on Defendants or other participants in the 3GPP process to put Cellular South's interests above their own. There are many ways for companies in Cellular South's position to ensure that their interests are protected in standard-setting bodies, particularly when those bodies operate by consensus – for example, by cooperating with similarly situated companies to employ a consultant to monitor proceedings. If Cellular South failed to take even that minimal step, it cannot blame Defendants or 3GPP, nor does its inaction give rise to any antitrust complaint.

In sum, no factual allegation of the TASC supports the conclusion that 3GPP failed to provide a legitimate process for the consideration and adoption of the industry standards that Cellular South challenges here.

## II.  PLAINTIFFS FAIL TO PROVIDE ANY PLAUSIBLE FACTS TO SUPPORT THE INFERENCE THAT DEFENDANTS UNLAWFULLY CONSPIRED

1.      The TASC also fails to provide any factual allegations to support the claim that AT&T Mobility conspired with anyone to subvert the 3GPP process to serve anticompetitive ends.  The crux of Plaintiffs' argument is that, because interference concerns did not provide a valid basis for adoption of Band 17, the creation of Band 17 was against the self-interest of Motorola and Qualcomm – which would lose "economies of scale" and the opportunity to sell "4G-LTE devices on a single band" rather than on Band 12 and Band 17 – and the only plausible inference for Motorola's and Qualcomm's support of the standard was a conspiratorial agreement with AT&T Mobility.  Opp. 43-44.  This inference, however, is entirely *im*plausible in light of the facts alleged in the complaint.

At the outset, Plaintiffs do not claim that they have offered any direct allegations to support their conspiracy claim.  As the Court noted, "there are no allegations of when [any] purported agreement happened, nor are there facts showing that particular individuals met at particular times, or even what such an agreement entailed."  Mem. Op. 18.  Plaintiffs have alleged nothing in the TASC to fill this void.

Plaintiffs' asserted basis for inferring the existence of a conspiracy likewise fails to make its claim plausible.  First, Plaintiffs allege no facts to justify the assertion that Motorola and Qualcomm agreed to sacrifice their own interests to benefit AT&T Mobility:  five years after the supposed conspiracy achieved its objective, there is no allegation that AT&T Mobility provided either Motorola or Qualcomm any "quid pro quo" to compensate them for the supposed losses they suffered as a result of the creation of Band 17.  Nor do Plaintiffs allege that AT&T Mobility ever threatened to withdraw business from Motorola or Qualcomm if they did not support Band

17 or any reason to believe that such a threat would be plausible. "Anything is possible" is not the basis for a plausible inference.

Second, and in any event, the assertion that Motorola and Qualcomm acted against their individual self-interest undermines the very basis for Plaintiffs' theory, because if the adoption of Band 17 was against the interests of Motorola and Qualcomm, it was likewise against the unilateral interests of the dozens of manufacturers and suppliers that participate in 3GPP. Each of those companies therefore would have been motivated to oppose the adoption of Band 17. None of those companies is alleged to have taken part in any supposed conspiracy. Yet, as the TASC concedes, *no one* opposed Band 17. The Court is not required to accept the assertion that the many sophisticated companies participating in 3GPP – like Ericsson, Nortel, Samsung, Apple, Nokia, LG, HTC, Blackberry, and so on – were incapable of protecting their own interests. Even though AT&T Mobility (and Qualcomm) emphasized this argument in moving to dismiss the TASC, Plaintiffs simply ignore it, and for good reason: there is no answer. Motorola and Qualcomm no more acted against their unilateral interests than any other 3GPP participant.

2. Plaintiffs' failure to make any plausible allegation that any of the Defendants acted against its unilateral self-interest further deprives the assertion that the justification for Band 17 was "pretextual" of any significance. In the decisions that Plaintiffs cite for the proposition that proof of pretext can bolster an inference of conspiracy, the plaintiffs in those cases offered direct or circumstantial evidence that the defendants had agreed to restrain trade – by refusing to deal with a competitor,[2] raising prices,[3] or restricting output.[4] Those claims

___

[2] *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998); *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469 (3d Cir. 1985).

[3] *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1 (D.D.C. 2008).

generally rested, in part, on allegations of conduct that would not have been in the individual defendants' self-interest absent agreement. The defendants then sought to rebut the inference that they acted pursuant to agreement by asserting that other factors accounted for their suspiciously parallel conduct. By presenting evidence that those asserted reasons were false, the plaintiffs provided additional support for the inference that the conduct was the product of prior agreement and not independent action. *See Rossi*, 156 F.3d at 478 (manufacturer gave up profitable sales; plaintiffs presented evidence that asserted reasons for doing so were false); *Fragale*, 760 F.2d at 474 (similar); *Linerboard*, 504 F. Supp. 2d at 57 (manufacturer took downtime, sacrificing sales and profits; plaintiffs presented evidence that reasons for doing so were pretextual); *cf. City of Moundridge*, 250 F.R.D. at 4 (plaintiffs maintained prices above competitive level; supposed shortages justifying price increases alleged to be false). By contrast, the TASC alleges that *all* of the companies participating in 3GPP agreed to the establishment of Band 17, indicating that the standard was in the individual self-interest of those companies as well. That Defendants supported a standard that also gained the support of the entire industry does not support an inference of conspiracy.[5]

---

[4] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal 2008); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38 (E.D. Pa. 2007).

[5] Plaintiffs also cite, in passing, cases where courts have held that, because a defendant's *unilateral* conduct allegedly resulted in the improper exclusion of competitors, the defendant would be required to provide some off-setting pro-competitive justification for its conduct. *See Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59 (2d Cir. 1997); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987 (9th Cir. 1993); *cf. Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986). Under that (incorrect) standard, the claim that asserted pro-competitive justifications are illusory may be relevant. In the case of joint standard-setting activity, however, the mere allegation that a standard places some competitors at a disadvantage without adequate technical justification does not suffice to state a claim – as this Court has already ruled. *See* AT&T Mobility Mem. 7-9.

Furthermore, "without more, evidence of pretext is insufficient" to support an inference that Defendants conspired. *Linerboard*, 504 F. Supp. 2d at 53 (citing *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1514 (11th Cir. 1989)). All of the cases that Plaintiffs rely on involved substantial traditional evidence of conspiracy. *See*, *e.g.*, *Rossi*, 156 F.3d at 468 (noting that plaintiff "adduced direct evidence of concerted action between [horizontal competitors]" in threatening plaintiff); *Fragale*, 760 F.2d at 474 (evidence that defendant repudiated agreement to sell to plaintiff after meeting with co-defendant); *Linerboard*, 504 F. Supp. 2d at 54-55 (noting "evidence of a traditional conspiracy, in conjunction with plaintiffs' ample evidence of motive and actions against interest"). Here, by contrast, presentation of accurate technical data pursuant to the established rules of an admittedly legitimate standard-setting body bears none of the hallmarks of a traditional conspiracy: it is, instead "on its face, lawful." Mem. Op. 21.

      **3.**     Concerns about the possibility that "a plaintiff with a largely groundless claim" may be able to "take up the time of a number of other people" through discovery "with the right to do so representing an *in terrorem* increment of the settlement value," *Whipple v. Favorite*, Civ. A. No. H-07-3923, 2009 WL 3255262, at *4 (S.D. Tex. Sept. 29, 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)), apply with special force here. The "potential expense is obvious enough in the present case": Plaintiffs seek to mount a collateral attack on standard-setting activity that took place several years ago and over a period of many months, involving foreign participants and international industry organizations. *Twombly*, 550 U.S. at 559. That factual complexity is only amplified by the potentially complicated economic issues underlying Cellular South's convoluted claims of harm. "[O]nly by taking care to require allegations that reach the level suggesting conspiracy" can the Court "avoid the potentially

enormous expense of discovery in [a] case[] with no reasonably founded hope that the [discovery] process will reveal relevant evidence to support a § 1 claim." *Id.* (internal quotation marks omitted; last alteration in original).

Furthermore, allowing Plaintiffs' complaint to proceed would tend to chill pro-competitive standard-setting conduct. As this Court noted, the establishment of technical standards, like the Band 17 standard at issue in this case, provides substantial benefits to competition and consumers. Mem. Op. 19. To permit a plaintiff to pursue an antitrust claim merely by arguing that a particular standard lacks sufficient justification and that its adoption must therefore involve an unlawful conspiratorial agreement could significantly raise the costs of participation in standard-setting activity. *Twombly* properly prevents such abuse of the antitrust laws.

## III. THE TASC ALLEGES NOTHING NEW IN SUPPORT OF PLAINTIFFS' REMAINING CLAIMS AND THEY HAVE PROVIDED NO BASIS FOR THIS COURT TO RECONSIDER ITS PRIOR ORDER OF DISMISSAL

Plaintiffs' remaining claims – related to the supposed delay of Band 12 standards and alleged "monopolization" by AT&T Mobility – are supported by no additional allegations of fact; Plaintiffs simply assert that the Court erred. *See* Opp. 49, 54. This Court should deny Plaintiffs' unjustified request for reconsideration. *See Rosenblatt v. United Way of Greater Houston*, 607 F.3d 413, 419 (5th Cir. 2010).

With respect to Plaintiffs' monopolization claim, Plaintiffs now assert that allegations that "AT&T purchased Band 17 devices and installed a Band 17 network (to the exclusion of Band 12 devices and a Band 12 network) when there was no technical justification for doing so" is "enough" to support a claim under Section 2. Opp. 54. But even assuming that Section 2 sometimes imposes a duty on a monopolist to avoid innovations that deliberately foreclose competing suppliers of complementary goods, *but see supra* n.1, AT&T has no antitrust duty to

14

take account of the interests of its competitors when it chooses which devices to distribute or which network to install. Plaintiffs can cite nothing to the contrary.

## CONCLUSION

For the reasons set forth above and in AT&T Mobility LLC's motion to dismiss, AT&T Mobility respectfully requests that this Court dismiss this action against it with prejudice pursuant to Rule 12(b)(6).

Dated: April 24, 2012

Respectfully submitted,

AT&T Mobility LLC

/s/ *David W. Upchurch*
DAVID W. UPCHURCH, MSB #10558
HOLLAND, RAY, UPCHURCH & HILLEN, P.A.
P.O. DRAWER 409
TUPELO, MS 38802-0409
TELEPHONE: 662-842-1721
FACSMILE: 662-844-613
dwu@hruhpa.com

Michael Kellogg (Admitted *Pro Hac Vice*)
Aaron Panner (Admitted *Pro Hac Vice*)
William J. Rinner (Admitted *Pro Hac Vice*)
Kellogg, Huber, Hansen, Todd,
   Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 326-7921
mkellogg@khhte.com
apanner@khhte.com
wrinner@khhte.com

## <u>CERTIFICATE OF SERVICE</u>

I, David W. Upchurch, hereby certify that I have this day filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following registered participants:

Alan W. Perry, Esq., MSB #4127
Daniel J. Mulholland, Esq., #3643
Walter H. Boone, Esq., #8651
Forman, Perry, Watkins, Krutz & Tardy, LLP
200 S. Lamar Street, Suite 100
Jackson, MS 39201-4099
Tel: 601-969-7833
Fax: 601-960-8613
aperry@fpwk.com

Charles L. McBride, Esq., MSB #8995
M. Patrick McDowell, Esq., MSB #9746
Joseph A. Sclafani, Esq., MSB #99670
Brian C. Kimball, Esq., MSB #100787
Brunini, Grantham, Grower & Hewes, PLLC
190 E. Capitol Street, Suite 100
Jackson, MS 39201-2151
Tel: 601-960-6891
Fax: 601-960-6902
cmcbride@brunini.com

Walter T. Johnson, Esq., MSB #8712
Watkins & Eager PLLC
400 East Capitol Street, Suite 300 (39201)
P.O. Box 650
Jackson, MS 39205
Tel: 601-965-1900
Fax: 601-965-1901
wjohnson@watkineager.com

*Counsel for Plaintiffs Cellular South, Inc.*
*Corr Wireless Communications, LLC and*
*CellularSouth Licenses, LLC*

L.F. Sams, Jr.
Otis R. Tims
Margaret Sams Gratz
Mitchell, McNutt & Sams, P.A.
P.O. Box 7120
Tupelo, MS 38802-7120
ssams@mitchellmcnutt.com
otims@mitchellmcnutt.com

Roger G. Brooks, Esq.
Yonatan Even, Esq.
Cravath, Swaine & Moore, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

*Counsel for Defendant Qualcomm Inc.*

Jim M. Greenlee, Esq.
Holcomb, Dunbar, Watts, Best, Masters & Golmon
400 South Lamar Blvd., Suite A
P.O. Drawer 707
Oxford, MS 39655
jgreenlee@holcombdunbar.com

John S. Gibson, Esq.
Chahira Solh, Esq.
Crowell & Moring, LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505

*Counsel for Defendant Motorola Solutions, Inc.*

DATED this the 24th day of April, 2013.

/s/ *David W. Upchurch*
DAVID W. UPCHURCH