UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


CORR WIRELESS
COMMUNICATIONS, L.L.C.,
CELLULAR SOUTH, INC., and
CELLULAR SOUTH LICENSES, LLC                    PLAINTIFFS

V.                          CIVIL ACTION NO. 3:12-CV-036-SA-SAA

AT&T, INC., AT&T MOBILITY LLC,
MOTOROLA SOLUTIONS, INC., MOTOROLA MOBILITY, INC.,
QUALCOMM INCORPORATED, and
JOHN DOES 1-10                                  DEFENDANTS

REPLY IN SUPPORT OF QUALCOMM INCORPORATED'S
RENEWED MOTION TO DISMISS PLAINTIFFS' COMPLAINT

L. F. Sams, Jr. (MSB #6426)
Otis R. Tims (MSB #8221)
Margaret Sams Gratz (MSB #99231)
MITCHELL MCNUTT & SAMS, P.A.
P.O. Box 7120
Tupelo, MS 38802
(662) 842-3871
ssams@mitchellmcnutt.com
otims@mitchellmcnutt.com
mgratz@mitchellmcnutt.com



Roger G. Brooks
Yonatan Even
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rgbrooks@cravath.com
yeven@cravath.com

April 24, 2013                *Attorneys for Defendant Qualcomm Incorporated*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ................................................................................................................3

I.      CELLULAR SOUTH'S CONSPIRACY THEORY IS UTTERLY *IM*PLAUSIBLE. .......3

        A.      Cellular South Alleges Only Implausible Technical Errors, Not Pretext. ...............3

        B.      Cellular South's Proposed Rule Is Untenable.........................................................7

        C.      Cellular South's "Pretext" Cases Further Highlight Its Pleading Failure...............9

        D.      Cellular South's Alleged Facts Show Procedurally Proper Standard-Setting. .......11

II.     CELLULAR SOUTH DOES NOT PLAUSIBLY ALLEGE HARM TO
        COMPETITION. .......................................................................................................13

III.    THE TECHNICAL ISSUES AND REMEDIES SOUGHT BY CELLULAR SOUTH
        ARE BEING CONSIDERED BY THE FCC. .................................................................14

CONCLUSION...........................................................................................................15

1337600

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Anderson News, L.L.C. v. Am. Media, Inc.,
680 F.3d 162 (2d Cir. 2012)....................................................................................8

Ashcroft v. Iqbal,
556 U.S. 662 (2009)..................................................................................................8

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007)............................................................................................7, 8, 9

Caldera, Inc. v. Microsoft Corp.,
72 F. Supp. 2d 1295 (D. Utah 1999)........................................................................10

CenturyTel of Chatham, LLC v. Sprint Commc'ns Co.,
CA No. 09-CV-1951, 2010 WL 5648871 (W.D. La. Dec. 15, 2010).........................14

City of Moundridge v. Exxon Mobil Corp.,
429 F. Supp. 2d 117 (D.D.C. 2006)..........................................................................10

Conley v. Gibson,
355 U.S. 41 (1957)....................................................................................................8

Consol. Metal Products, Inc. v. Am. Petroleum Inst.,
846 F.2d 284 (5th Cir. 1988) .....................................................................................5

Cuvillier v. Taylor,
503 F.3d 397 (5th Cir. 2007) .....................................................................................8

Dimidowich v. Bell & Howell,
803 F.2d 1473 (9th Cir. 1986) .................................................................................10

Eastman Kodak Co. v. Image Tech. Servs.,
504 U.S. 451 (1992)..................................................................................................9

Fragale & Sons Beverage Co. v. Dill,
760 F.2d 469 (3d Cir. 1985)..................................................................................10,11

Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.,
789 F. Supp. 760 (S.D. Miss. 1992), *aff'd mem.*, 986 F.2d 1418 (5th Cir. 1993) .......14

Golden Bridge Tech., Inc. v. Motorola, Inc.,
547 F.3d 266 (5th Cir. 2008) ............................................................................8, 9, 12

1337600

Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,
  128 F.3d 59 (2d Cir. 1997)............................................................................10

High Tech. Careers v. San Jose Mercury News,
  996 F.2d 987 (9th Cir. 1993) .......................................................................10

Image Tech. Servs., Inc. v. Eastman Kodak, Co.,
  125 F.3d 1195 (9th Cir. 1997) .....................................................................11

In re Linerboard Antitrust Litig.,
  504 F. Supp. 2d 38 (E.D. Pa. 2007) ............................................................10

Lormand v. US Unwired, Inc.,
  565 F.3d 228 (5th Cir. 2009) ....................................................................8, 9

Rossi v. Standard Roofing,
  156 F.3d 452 (3d Cir. 1998)........................................................................10

TFT-LCD (Flat Panel) Antitrust Litig.
  586 F.Supp. 2d 1109 (N.D. Cal. 2008) .......................................................11

TruePosition, Inc. v. LM Ericsson Tel. Co.,
  CV-11-4574, 2012 WL 3584626 (E.D. Pa. Aug. 21, 2012) ........................11

United States v. Dentsply, Int'l, Inc.,
  277 F. Supp. 2d 387 (D. Del. 2003), *rev'd*, 399 F.3d 181 (3d Cir. 2005) ....................9

Viazis v. Am. Ass'n of Orthodontists,
  182 F. Supp. 2d 552 (E.D. Tex. 2001), *aff'd*, 314 F.3d 758 ........................13

Viazis v. Am. Ass'n of Orthodontists,
  314 F.3d 758 (5th Cir. 2002) ......................................................................10

Wilson v. Birnberg,
  667 F.3d 591 (5th Cir. 2012) .........................................................................8

iii

PRELIMINARY STATEMENT

As Qualcomm pointed out in its opening brief (ECF No. 131, "QC Mem."), the TAC is nothing but a motion to reargue. Cellular South now concedes as much. CS's Opposition is a collection of meritless attacks on the Court's August 31, 2012 Opinion, in which CS asserts this Court had reached "unsupported conclusion[s]", applied an incorrect standard because it "took Defendants' bait", and made "factual determination[s] [that] should not [have been] made". (ECF No. 150 ("Opp'n") at 38, 49-50.) Procedurally, this "do over" is an inappropriate and unfair burden on Defendants and this Court. Substantively, CS is wrong, and the allegations of its TAC continue to substitute wild leaps of insidious suspicion for the required pleading of facts.

CS tries to downplay the "do over" nature of this complaint by asserting that "the Court has not evaluated the plausibility of the other elements of the antitrust claims set forth in this and the prior versions of the Complaint *within the context of a complaint that alleges that interference justifications were pretextual*". (Opp'n at 40-41 (emphasis added).) But this is nonsense. "Pretext" was at the very heart of CS's initial complaint.[1] CS asserted before, as it does now, that its allegation of "pretext" must be accepted as true, and that this allegation alone rendered CS's other allegations sufficient.[2] This Court has carefully considered and rejected those arguments. (ECF No. 100 ("Mem. Op.") at 21 (rejecting argument "that Defendants'

---

[1] *E.g.*, FAC (ECF No. 75) ¶¶ 147 ("[T]he Defendants conspired to cause 3GPP . . . to carve out Band 17 from Band 12 and to delay development of Band 12 devices by exaggerated and *pretextual* statements with respect to interference in Lower A Block spectrum."), 198 ("The various excuses and *pretexts* offered by AT&T and the other Defendants as a basis to justify the creation of Band 17 have no merit."), 199 ("The technical justifications for those actions were (and are) nothing more than a *pretext* . . . ."), 200 ("AT&T and its co-conspirators advanced . . . assertions of multiple hypotheses to justify the creation of Band 17, all of which were *pretextual*."). (Emphases added.)

[2] *E.g.*, Tr. of July 17, 2012 Hr'g (ECF No. 96) at 49:1-7 ("We have alleged that the reasons enunciated for creating Band 17 were pretextual . . . . At this stage of the proceedings, we're entitled to have that allegation accepted . . . ."); 113:19-22 ("[O]nce you accept . . . that for purposes of this motion interference was pretextual, it follows . . . that they had no reason to create Band 17 . . . .").

technical justifications set forth during the 3GPP process are merely pretext . . .").)  The TAC adds nothing of substance regarding "pretext", and offers no reason for this Court to deviate from its prior ruling.  (QC Mem. at 11.)  Simply put, even accepting as true CS's allegation that each of the interference problems identified by Defendants was insubstantial, CS fails plausibly to allege that each of the Defendants *believed* that to be the case, let alone that they supported standardization of Band 17 pursuant to a *conspiracy*.  To the contrary, indisputable facts—such as the lack of any objection to the standardization of Band 17 from influential handset and chip makers, as well as from Verizon, and the utter lack of motive for the alleged conspiracy—make CS's allegations completely *im*plausible.  (Part I.)

CS similarly does not cure its failure to allege competitive harm.  In fact, CS now effectively concedes the absence of competitive harm in two of the three markets it alleged.  Its allegations of competitive harm in the remaining market—which boil down to a complaint about the alleged unavailability of a Band 12 iPhone—are woefully insufficient.  (Part II.)

And, finally, CS fails properly to account for the fact that even if the TAC had stated a claim, the remedies sought by CS—and the technical issues allegedly warranting them—are currently being analyzed (at CS's own prodding) by an expert agency, which is required to assess them on the basis of broad policy grounds.  Qualcomm has shown that this reality requires that the Court defer to the FCC's primary jurisdiction, both as a matter of law and common sense. (QC Mem. at 25-29.)  Instead of a substantive response, CS falsely accuses Qualcomm—yet again—of arguing elsewhere that the FCC lacks jurisdiction to order the remedies sought in this case.  But Qualcomm has never challenged the FCC's jurisdiction.  Given the FCC's mandate, the time it has already dedicated to its investigation, and the fact that CS no longer argues that

2

there is any urgency in resolving this case, this Court should defer to the FCC proceeding—if,

that is, it finds that this case should proceed at all. (Part III.)

## ARGUMENT

I.     CELLULAR SOUTH'S CONSPIRACY THEORY IS UTTERLY *IM*PLAUSIBLE.

  A.     Cellular South Alleges Only Implausible Technical Errors, Not Pretext.

In the context of its "pretext" argument, CS declares that the decisive question is

"whether the creation of Band 17 was required in order to deal with the interference which the

Defendants have identified". (Opp'n at 11.) Actually, that is far from the real question before

this Court: Whether CS has alleged *facts* supporting a reasonable inference of a *conspiracy*.

As to the facts concerning interference, despite a great deal of sound and fury in CS's

brief (Opp'n 10-16), the TAC itself repeatedly *admits* that interference is a real issue potentially

affecting the operation of LTE on Band 12.[3] The TAC discusses six sources of interference, and

does not meaningfully dispute the existence of *any* of them.[4] CS just asserts a hodgepodge of

reasons why, in CS's *opinion*, none of these sources of interference "justified" (a vague and

undefined concept) standardizing Band 17. Most notably, CS does not dispute that at least one

type of interference—Channel 51 reverse power amplifier intermodulation interference—

actually *could* potentially be mitigated through the creation of Band 17, but nonetheless contends

that it did not *justify* Band 17 because the same interference could also be eliminated with

---

[3] TAC ¶¶ 255 (Channel 51 broadcast interference on Band 12 is a real issue that "many parties are
requesting the FCC to address"), 257 (both Channel 51 broadcast station interference and Band 12
transmission interference with TV set-top boxes is "real"); Tr. of July 17, 2012 Hr'g, at 50:2-3
(representing that "some of the interference [Defendants a]re talking about is really there").

[4] TAC ¶¶ 255 (Channel 51 broadcast station interference), 256 (Band 12 transmission interference with
TV set-top boxes), 258-59 (interference due to Channel 51 reverse power amplifier intermodulation), 260
(device receiver blocking interference by Lower D and E Block transmissions), 261 (interference due to
reverse power amplification intermodulation of Lower D and E Block transmissions with device
transmissions), 262 (interference due to out-of-band emissions).

"workarounds", including proper "network programming" and "radio frequency design measures".[5] CS also concedes that three additional types of interference (Channel 51 broadcast interference, Band 12 transmission interference with TV set-top boxes, and device receiver blocking interference by Lower D and E Block transmissions) would affect operations on Band 12, but alleges that they would affect *only* operators on Block A[6]—as though this could be of no legitimate concern to component and device makers such as Qualcomm and Motorola.[7]

Starting from the technical *facts* alleged, only a long and tenuous chain of speculative inferences could get one to the conclusion that Qualcomm was part of any conspiracy. One would have to infer that:

- Qualcomm *knew* for a fact, back in 2008, that certain interference that would have affected AT&T could be dealt with through "workarounds", "network programming" and design measures; that other types of interference would affect AT&T even after Band 17 had been standardized; and that yet other types of interference affected only A-Block spectrum;

- Qualcomm weighed the various sources of interference, their impacts, and potential engineering solutions, and made a judgment that none of these sources of interference, individually or collectively, "justified" standardizing Band 17;

- Qualcomm supported standardizing Band 17 notwithstanding its judgment that its creation was not warranted, *i.e.*, based on pretextual interference concerns; and

- Qualcomm's pretextual support for Band 17 was pursuant to an *agreement* with the other Defendants.

---

[5] TAC ¶ 259 (conceding that Channel 51 reverse power amplifier intermodulation interference could "pose a . . . concern" and would require "workarounds" to "completely eliminate any chance of interference"); *see also* TAC ¶ 252 (conceding the possibility that interference presented "engineering issues that must be resolved").

[6] TAC ¶¶ 255 ("[T]here is no dispute that a nearby Channel 51 broadcast station will interfere with a wireless carrier if it operates on the Lower A Block."), 256 (admitting that Band 12 transmission interference with TV set-top boxes might interfere with wireless operations on the Lower A Block), 260 (acknowledging device receiver blocking interference by Lower D and E Block transmissions, if any, "would only apply to Band 12 devices operating on a Lower A Block network").

[7] CS further concedes that two other types of interference (reverse power amplifier intermodulation of Lower D and E Block transmissions with device transmissions, and out-of-band emissions interference) would affect AT&T, but opines that such interference would not be alleviated by the creation of Band 17. TAC ¶¶ 261-62.

1337600

The mere allegations that interference problems are, as a technical matter, not severe, or could be solved by "mitigation", engineering efforts, and "workarounds", do not even start down the road towards a plausible inference that Qualcomm (and the other Defendants) shared this view *at the time* that Band 17 was proposed. Certainly, CS does not allege any fact (such as reference to a conversation or a public statement) suggesting that Defendants did not believe the concerns they raised; all is inference, and implausible inference at that. And, as the Fifth Circuit explicitly and correctly held in *Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284, 293-95 (5th Cir. 1988), the mere fact that a decision by a standard-setting body was not technically justified cannot support an inference of conspiracy where there is no evidence of "bad faith", simply on the basis of "scant evidence suggesting an unlawful purpose" and "evidence . . . suggest[ing] nothing more than a technical debate among engineers". Here, CS does not allege that there was even a "technical debate" about Band 17, because there was *unanimous* acceptance by 3GPP. On this slim basis, an inference of pretext, let alone conspiracy, is completely *im*plausible, for at least two overarching reasons.

1.     The lack of objection by any 3GPP attendee.

As set out in Qualcomm's Renewed Motion, the fact that the technical concerns were "duly contemplated at 3GPP meetings" (Mem. Op. at 21) with not a single entity objecting, makes it highly *im*plausible that the expressed interference concerns were pretextual and advanced (or supported) only in bad faith. (QC Mem. at 22.) Attendees at relevant meetings included influential handset and chip makers such as Samsung, LG Electronics, Research in Motion, Freescale, and Nokia (QC Mem. 21-22; CS Mot. to Amend (ECF 120), Exs. F at 122-24, G at 157-60, and H at 133-36 (attendance lists for RAN4 Working Group meetings)), as well as Verizon, the largest holder of A-Block spectrum (Mem. Op. at 37).

1337600

CS cannot reconcile its allegations of pretext and unjustified technical concerns with the facts of due consideration of the issues and unanimous acceptance. So instead, CS incoherently argues that standardization was economically *irrelevant* to other chip and handset makers (TAC ¶¶ 209-221), while at the same time attempting to prop up an inference of bad faith by asserting that Band 17 would decrease "economies of scale" and thus would be *contrary to* the economic interests of "a rational supplier of chipsets" or "devices", such as Qualcomm and Motorola, respectively (TAC ¶ 315). Qualcomm detailed the inconsistent nature of these allegations in its opening brief (QC Mem. 21-22); the Court will find no response at all in CS's papers.

As to Verizon, the elephant in the room, CS now alleges—for the first time—highly speculative motives for Verizon's acquiescence in standardization, not alleged in the complaint, and "not all of which" (CS tries to reassure the Court) "are inconsistent with each other". (Opp'n at 36.) But they are indeed inconsistent, as well as implausible. CS postulates in its brief that Verizon actually "intended to *use* the [Lower A-Block] spectrum", and therefore would be "advantaged" by standardization because it could then acquire additional licenses at devalued prices. (Opp'n at 35 (emphasis added).) This latest speculative motive is directly contrary to the pleaded allegation that Verizon "has no disclosed plans or apparent interest in the immediate development of its Lower A Block spectrum" and has instead begun *selling* these licenses. (TAC ¶ 203.)[8] No doubt because of these inconsistencies, CS admits that attributing a motive to Verizon would be mere "speculation". (Opp'n at 36.) Perhaps so, but that cannot erase Verizon from the picture, as CS would like to do. Focusing on the facts alleged, the Court properly found it utterly *im*plausible that Verizon would sit idly by while its arch rival AT&T took actions

---

[8] For similar reasons, CS's contention that Verizon may have seen the standardization of Band 17 as helpful toward developing separate "ecosystems" for AT&T and Verizon, Opp'n 36, is equally implausible. If, as CS alleges, Verizon had no interest in using the Lower 700 MHz spectrum, standardizing Band 17 would be unnecessary to preserve Verizon's Upper 700 MHz "ecosystem".

1337600

intended to devalue Verizon's spectrum based on technical reasons that were "merely pretext". (Mem. Op. at 21, 37.)

       2.   <u>Lack of motive to engage in far-fetched conspiracy to devalue spectrum.</u>

In addition, CS still alleges no credible motive for the alleged conspiracy. (Mem. Op. at 36-37.) CS maintains that AT&T sought to standardize Band 17 to devalue the Lower A-Block spectrum, so that it could purchase that spectrum at fire sale prices years later. (TAC ¶¶ 418-20.) This Court already found this motive to be "utterly implausible" and "based on layer and layer of factual speculation", including the following:

- First, that rather than bidding on Lower A-Block spectrum in 2008, AT&T "concocted . . . a conspiracy with Motorola and Qualcomm to allow other entities, including Verizon", its fierce rival, "to buy the spectrum".

- Second, that AT&T intended to devalue the spectrum by submitting numerous fraudulent public technical submissions to 3GPP and the FCC.

- Third, that Qualcomm, Motorola and others joined in the "scheme to defraud 3GPP and the FCC" by submitting fraudulent submissions.

- Fourth, that Verizon, "the largest holder of A Block spectrum", "simply acquiesced" to these actions intended to devalue this spectrum.

- Fifth, that AT&T had the "foresight" to know that these actions would succeed in devaluing the spectrum, thus allowing it "the ability to possibly purchase" that spectrum years later for a lower price.

(Mem. Op. at 36-37.) CS has done nothing to rectify or explain this chain of implausibility. Its allegations of pretext and conspiracy thus remain utterly implausible, and should be dismissed.

    B.   <u>Cellular South's Proposed Rule Is Untenable.</u>

In an apparent attempt to steer the Court away from its prior sound assessment of CS's implausible conspiracy theory, CS seeks to restate the law in a way that would do away with *Twombly*, at least in the standard-setting context. *Twombly* taught that, because parallel conduct is "just as much in line with a wide swath of rational and competitive business strategy", *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007), and because the expense of antitrust discovery

warrants requiring robust allegations to weed out meritless cases at the pleading stage, *id.* at 558-59, mere allegations of parallel conduct that is "*more likely* explained by" independent action cannot constitute a "plausible" factual basis for an inference of conspiracy for purposes of Sherman Act Section 1 claims, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (emphasis added) (citing *Twombly*, 550 U.S. at 567).[9]

CS is attempting an end run around these safeguards by asserting that if a plaintiff alleges that the technical basis for a decision made by a standard-setting organization was incorrect, and further pleads certain technical reasons for that allegation, then those allegations are by themselves sufficient to give rise to a plausible inference (i) that the technical basis advanced at the standard-setting organization was "pretextual"—*i.e.*, advanced in bad faith—and (ii) that all who supported the decision must have done so pursuant to a conspiracy.

The *Twombly* pleading loophole urged by CS cannot be the law—and, as made clear by the Fifth Circuit's decision in *Golden Bridge Technology, Inc. v. Motorola, Inc.*, it is not. 547 F.3d 266, 271-73 (5th Cir. 2008) (declining to infer concerted action based on technology exclusion at 3GPP); *see* Mem. Op. 19-20.[10] If it were, every company that makes or merely

---

[9] CS cites *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) and the Second Circuit's decision in *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) for the proposition that the Court may not weigh plausibility among inferences. Opp'n 8-9. But these cases are inapposite where, as here, the choice is not between two plausible inferences, but rather between a plausible inference of unilateral conduct and an utterly *im*plausible inference of an anticompetitive agreement.

[10] CS attempts to muddle the governing authority by quoting *Wilson v. Birnbaum*, 667 F.3d 591, 600 (5th Cir. 2012), to say that the Court may not dismiss the complaint "unless it is beyond doubt that Cellular South cannot prove a plausible set of facts to support the allegations". Opp'n at 9 (internal quotation marks omitted). The language CS relies on is almost identical to the "*no set of facts*" standard from *Conley v. Gibson*, 355 U.S. 41 (1957) (emphasis added), which was "retire[d]" by the Supreme Court in *Twombly*, 550 U.S. at 563, and has long been rejected by the Fifth Circuit. *See, e.g.*, *Lormand*, 565 F.3d at 257 n.23; *Cuvillier v. Taylor*, 503 F.3d 397, 401 n.4 (5th Cir. 2007). But *Wilson* did not reinstate *Conley*; it makes clear that a plaintiff must plead a "*plausible*" set of facts. As discussed, CS offers *no* facts in its TAC that could support a plausible inference of conspiracy. Moreover, it would be particularly inappropriate to look to *Wilson*, a due process and equal protection case relating to the constitutionally sensitive issue of ballot access, to walk back the teachings of *Twombly* in this case, given

---

8

votes in favor of a proposal in a standards meeting will do so at risk of a dismissal-proof antitrust lawsuit—even if, as here, not a single voice objected at the time. Standard setting would become impossible. This, in spite of the law's recognition that standard setting provides important pro-competitive benefits.[11] The Court should reject CS's invitation to depart not only from its own prior decision, but from the law of this Circuit and elsewhere.

C.    Cellular South's "Pretext" Cases Further Highlight Its Pleading Failure.

CS cites a mass of cases that it offers under the heading of "Pretextual Allegations In The Context Of Antitrust Cases". (Opp'n at 3.) CS hopes to persuade the Court that if a plaintiff says "pretext" and "antitrust" enough times in close proximity, that will *per se* be enough to support an inference of agreement. None of the cases CS cites supports that proposition.

Several of the cases CS cites have nothing to do with conspiracy, but instead concern conduct that, under the relevant law, is illegal unless justified by pro-competitive effects. In this context, courts have held in some factual scenarios that the question of whether a pro-competitive justification was "pretextual" could not be decided on summary judgment.[12] This question is simply unrelated to the question of whether a conclusory allegation of "pretext" makes an inference of *conspiracy* "plausible". Other cited cases deal with irrelevant issues of the

---

the specific concern articulated by the Supreme Court about the cost of discovery in meritless *antitrust* cases. *Twombly*, 550 U.S. at 559.

[11] Mem. Op. at 19 (quoting *Golden Bridge*, 547 F.3d at 273 ("Potential procompetitive benefits of standards . . . include facilitating economies of scale in the market for complementary goods, reducing consumer search costs, and increasing economic efficiency.")).

[12] *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 483-84 (1992) (on a motion for summary judgment, finding a question of fact whether Kodak's "quality" justification for excluding third-party servicing of its equipment was pretext, in light of evidence that other organizations offered quality services); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 991 (9th Cir. 1993) (on a motion for summary judgment, finding a question of fact whether "editorial control" justification for refusing to run newspaper insert was pretext, where evidence showed newspaper ran other ads over which it had no editorial control); *see also United States v. Dentsply, Int'l, Inc.*, 277 F. Supp. 2d 387, 440-41, 453 (D. Del. 2003) (finding that justification for exclusionary business practice was pretextual where that justification was contradicted by evidence, but nevertheless entering judgment after trial of no antitrust violation), *rev'd*, 399 F.3d 181 (3d Cir. 2005).

sufficiency of pleading "trade or commerce" in a monopolization claim,[13] or whether conduct

was "unreasonably restrictive of competition".[14]

Next, CS cites six decisions—most of them pre-*Twombly*—that at least touch on the

question of inferring concerted action from pretext, but do not address the adequacy of *pleading*.

Notably, these courts gave short shrift to claims of "pretext" unaccompanied by specific facts

showing a direct agreement or other strong circumstantial evidence of conspiracy.  In three cases

cited by CS, conspiracy claims were *rejected* for this reason (one following trial, one on

summary judgment, and one in connection with a request for a preliminary injunction).[15]  On the

flip side, in three summary judgment decisions cited by CS from other circuits, in which

evidence of pretext was found to be relevant to an inference of concerted action, that evidence

was *in addition* to other, more direct evidence of agreement.  In none was a bare allegation of

pretext considered a sufficient basis to infer conspiracy.[16]

---

[13] *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59 (2d Cir. 1997).

[14] *Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1313  (D. Utah 1999).

[15] *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 764-65 (5th Cir. 2002) (affirming judgment as a matter of law following trial of no conspiracy where the plaintiff offered no evidence that standard employed by association to deny adoption of plaintiff's invention was pretextual); *Rossi v. Standard Roofing*, 156 F.3d 452, 474-75, 478-82 (3d Cir. 1998) (as to one defendant, holding that creating a genuine issue of material fact as to pretext was "simply not enough" to survive summary judgment where there was no "direct evidence (or other strong circumstantial evidence) of concerted action"; as to other defendant, finding fact issue of conspiracy where, in addition to offering pretextual excuses for refusals to deal, defendant singled out the plaintiff, acted contrary to its distribution policy, threatened and punished other distributors who resold to the plaintiff, and cooperated with a coconspirator in monitoring and enforcing refusal to deal); *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 134 (D.D.C. 2006) (in denying preliminary injunction, holding that "For evidence of pretext to support an inference of conspiracy, . . . it must be supported by additional evidence of opportunity to conspire, direct evidence of an agreement, or other circumstantial evidence of restraint of trade").

[16] *Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986) (where there was direct evidence of a proposal for a concerted refusal to deal, evidence that subsequent reason given for refusal to deal was pretextual would further support an inference of concerted action); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 49, 53-60 (E.D. Pa. 2007) (in light of substantial evidence of an "extensive and interconnected" conspiracy, including evidence that the competitors' communications were inappropriate and "abnormal" and discussed market prices, evidence of pretextual explanations was relevant to question of whether the plaintiffs' evidence tended to "exclude the possibility of independent action"); *Fragale &*

The two pleading cases that CS cites—*TFT-LCD (Flat Panel) Antitrust Litigation*, 586

F. Supp. 2d 1109 (N.D. Cal. 2008), and *TruePosition, Inc. v. LM Ericsson Tel. Co.*, CV-11-4574,

2012 WL 3584626 (E.D. Pa. Aug. 21, 2012)—likewise do not suggest that an allegation of

"pretext" must be accepted as a "factual allegation" that is sufficient to make an inference of

conspiracy "plausible".  In both cases, the district courts denied a motion to dismiss citing factual

allegations of agreement or conspiracy; allegations of pretext were taken into account, but were

not themselves deemed sufficient.[17]

In sum, these cases do not bestow talismanic power on the word "pretext", as CS would

hope; "pretext" is a conclusion, an inference drawn from specific facts regarding state of mind.

*See, e.g.*, *Image Tech. Servs., Inc. v. Eastman Kodak, Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997)

("Evidence regarding the state of mind of Kodak employees may show pretext, when such

evidence suggests that the proffered business justification played no part in the decision to act.").

CS pleads no such facts.  Accordingly, none of these cases supports CS in its mission to

transmogrify the supposed technical error that CS *does* allege into "pretext" and conspiracy.

D.      Cellular South's Alleged Facts Show Procedurally Proper Standard-Setting.

The adequacy of CS's allegations is additionally undermined by the fact that the 3GPP

process was "followed to the letter" and CS pled no "plausible facts demonstrating that the 3GPP

standard setting process was biased or otherwise subverted", as it was in *Allied Tube*.  (Mem. Op.

---

*Sons Beverage Co. v. Dill*, 760 F.2d 469, 473-74 (3d Cir. 1985) (finding sufficient evidence of conspiracy where there was evidence of a meeting between defendants, that the defendants dealt with all distributors other than the plaintiff, and that reasons given for refusal to deal were pretextual).

[17] In the *Flat Panel* case, the complaint alleged that the defendants exchanged sensitive competitive and pricing information, and "allege[d] specific instances of invitations to agree and subsequent agreements" to raise prices.  586 F. Supp. 2d at 1116.  Likewise, in *TruePosition*, the court included an allegation of pretext among several allegations that, in their totality, it found adequately supported an inference of conspiracy, including allegations of motive and violations of 3GPP rules.  2012 WL 3584624, at *22-23.

11

at 21-22.)  *Golden Bridge*, with persuasive reasoning adopted by this Court, shows why, under

these circumstances, such standard-setting cannot give rise to an inference of conspiracy:

> "We have found it 'axiomatic' that a standard setting organization
> must exclude some products, and such exclusions are not themselves
> antitrust violations.  To hold otherwise would stifle the beneficial
> functions of such organizations, as fear of treble damages and judicial
> second-guessing would discourage the establishment of useful industry
> standards.  Accordingly, we decline to infer conspiratorial action on
> the basis of limited circumstantial evidence, particularly where this
> evidence is at least as consistent with permissible competition, and
> with independent action, as with unlawful conspiracy."

(Mem. Op. at 19 (quoting *Golden Bridge*, 547 F.3d at 273) (citations and internal quotation

marks omitted).)

CS argues for reconsideration of this Court's prior reading of *Allied Tube* on two fronts,

but is wrong on both counts.  *First*, CS tries to distinguish *Golden Bridge* on the purported basis

that it involved the exclusion of "inconsistent elements from a compatible standard", while the

standardization of Band 17 supposedly resulted in two incompatible standards.  (Opp'n at 27-

28.)  But if there is anything to the distinction, it cuts the other way.  In *Golden Bridge*, the

decision was more harsh; plaintiff's technology was totally *excluded* from the 3GPP standard.

Here, there is no exclusion; Band 12 remains part of the 3GPP standard, alongside Band 17.[18]

*Second*, CS contends that there were no "meaningful safeguards" to prevent

standardization from being dominated by Defendants because 3GPP attendees other than

Defendants supposedly did not "kn[o]w about, care[] about, or discuss[] the creation of Band

17".  (Opp'n at 22, 31-32 (summarizing TAC ¶¶ 209-15).)  But participation by some magic

number of attendees is not the bar.  If it were, that would force standards-setting organizations—

---

[18] In any case, the obscure distinction CS proposes cannot possibly define the line between actionable and proper SSO conduct.  SSO participants (who are generally engineers) can make good faith efforts to follow SSO procedural rules, but they cannot be required to parse scholastic distinctions, such as CS is advocating, on peril of antitrust liability.

on pain of antitrust liability—to compel members who have no interest in and are uninformed about particular aspects of standards to vote on every decision (*see* QC Mem. at 19-20)—hardly a recipe for developing the best technical standards.  No precedent or logic supports any such rule.  Rather, what matters under *Allied Tube* is that there was a sensible standard-setting process (here, codified as working procedures, *see* 3GPP Working Procedures (ECF No. 130, Ex. F)), and that this process was "followed to the letter", without "subver[sion]", "procedural irregularities", "sham" or "bias[]".  (Mem. Op. at 21-22.)  The fact that influential companies including Verizon, Samsung, LG and others did not object to standardization of Band 17 (*see supra* section I.A.1) makes even more clear that this case is nothing like *Allied Tube*.

## II.    CELLULAR SOUTH DOES NOT PLAUSIBLY ALLEGE HARM TO COMPETITION.

To survive dismissal, a plaintiff must plead harm to competition *in a relevant market*.[19] As Qualcomm detailed in its opening brief, CS alleges three purported relevant markets—a "lower 700 MHz device purchase market", a "700 MHz roaming access market", and a "wireless communications services market"—but fails to allege harm to competition in *any* of them.  (QC Mem. at 23-25.)  Strikingly, as to the alleged "lower 700 MHz wireless device purchase market" and "700 MHz roaming access market", CS offers no response at all.

As to the alleged "wireless communications services market", CS now relies entirely on the assertion that—even though CS sells an LTE iPhone 5—the unavailability of an iPhone 5 *on Band 12* supposedly "is harmful to CS", which CS claims "demonstrates . . . harm[] [to] competition".  (Opp'n at 57.)[20]  But this cannot sufficiently allege harm to competition, for three

---

[19] *See, e.g.*, *Viazis v. Am. Ass'n of Orthodontists*, 182 F. Supp. 2d 552, 569 (E.D. Tex. 2001), *aff'd*, 314 F.3d 758; *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 766-67, 778 (S.D. Miss. 1992), *aff'd mem.*, 986 F.2d 1418 (Table) (5th Cir. 1993).

[20] By its Motion to Exclude (ECF No. 143), CS demands that the Court blind itself to the indisputable fact that CS is actively selling an LTE iPhone.  As Qualcomm explains in its Combined Reply in Support of

reasons. First, pleading harm to CS is insufficient to allege harm to *competition*. *Futurevision*, 789 F. Supp. at 766-67. Second, "Cellular *on Band 12*" is not an alleged market, and CS is actively promoting and selling the iPhone 5 in the market it *does* allege: "wireless communications services". Third, as Qualcomm argued in its opening brief, CS alleges that existing competitors are able to expand, willing to expand, and imminently are expanding into this market, negating any plausible claim of competitive harm to a "wireless communications services market" in Northern Mississippi. (QC Mem. at 25.)[21] Again, CS has no response.

III.    THE TECHNICAL ISSUES AND REMEDIES SOUGHT BY CELLULAR SOUTH ARE BEING CONSIDERED BY THE FCC.

In its Renewed Motion, Qualcomm argued that even if the Court were to find that the TAC states a claim, the Court should stay this case while the FCC decides the technical issues and remedies at the heart of this dispute. (QC Mem. at 25-29.) CS fails to offer a substantive response, and offers no solution to the potential inconsistency between decisions by this Court and by the FCC—inconsistency that would cause confusion and inequity in the wireless industry and have an adverse impact on nationwide competition, as any court order would bind the three Defendants, but not their competitors around the country. *CenturyTel of Chatham, LLC v. Sprint Commc'ns Co.*, CA No. 09-CV-1951, 2010 WL 5648871, at *4 (W.D. La. Dec. 15, 2010).

In lieu of a substantive response, CS launches a flurry of distractions. CS, for the second time, misrepresents to the Court that "Defendants", *including Qualcomm*, have "maintained . . .

---

Judicial Notice and Opposition to CS's Motion to Exclude, the law does not require this Court to let itself by victimized by such misleading allegations that are flatly contradicted by undisputed facts.

[21] CS attempts to distract from its failure to address the existence of multiple competitors by bare assertion, referring the Court to a section in its Complaint labeled "Impact on Competition" and citing a string of paragraphs that allegedly discuss harm to competition. Opp'n at 55. However, headings and paragraph counts cannot distract from CS's failure to explain how harm to itself is sufficient to plead harm to competition, when other competitors exist and are unaffected by the conduct at issue.

1337600

that the Commission has no statutory authority to order the relief requested in the Interoperability

Petition". (Opp'n at 58.) This is false, as CS should know; Qualcomm's position was detailed in

its FCC submissions and in its previous motion papers, which make clear that Qualcomm has

never challenged the FCC's jurisdiction.[22] CS also attempts to sow confusion about what the

FCC has said in its NPRM about interference (TAC ¶ 269), but CS cannot change what it has

already admitted about the reality of interference issues that are before the FCC (*see supra*

section I.A), nor can it change the FCC's clear statements about the scope of its rulemaking

investigation (*see* QC Mem. at 17-18). CS complains about the pace of the FCC rulemaking

process. (Opp'n at 58-60, 68-72.) But the FCC's thorough investigative procedures are suited to

the technical complexity of the issues before it, and in any event, CS makes no effort to

resuscitate its cries of urgency, nor its motion to expedite, which this Court dismissed as moot.

(*See* QC Mem. at 3-4; Text Order of March 18, 2013.)


## CONCLUSION

For the reasons set forth above, in Qualcomm's Renewed Motion, and in the motions

filed by co-Defendants, which Qualcomm joins, Qualcomm respectfully submits that Cellular

South's Third Amended and Supplemental Complaint should be dismissed in its entirety, with

prejudice, as against Qualcomm.

---

[22] In its June 2012 reply brief in support of its motion to dismiss, Qualcomm made clear that it has *never* argued that the FCC lacks the *authority* to issue an order requiring interoperability across the Lower 700 MHz spectrum; instead, Qualcomm has consistently taken the position that the FCC *should* not issue such an order due to the difficulties such an order would create for consumers, and because Qualcomm itself is working on a technical solution that would allow interoperability across Bands 12 and 17. *See* Reply Mem. of Law in Supp. of Def. Qualcomm Inc.'s Mot. to Dismiss Pls.' Compl. (ECF No. 89) at 4-5.

1337600

Dated: April 24, 2013

Respectfully submitted,

/s/ L.F. Sams, Jr.

L. F. Sams, Jr. (MSB #6426)
Otis R. Tims (MSB #8221)
Margaret Sams Gratz (MSB #99231)
MITCHELL MCNUTT & SAMS, P.A.
    P.O. Box 7120
        Tupelo, MS 38802
           (662) 842-3871
                ssams@mitchellmcnutt.com
                otims@mitchellmcnutt.com
                mgratz@mitchellmcnutt.com


Roger G. Brooks
Yonatan Even
CRAVATH, SWAINE & MOORE LLP
    Worldwide Plaza
        825 Eighth Avenue
           New York, NY 10019
             (212) 474-1000
                rgbrooks@cravath.com
                yeven@cravath.com

*Attorneys for Defendant Qualcomm Incorporated*

16

## CERTIFICATE OF SERVICE

I, L. F. Sams, Jr., one of the attorneys for defendant Qualcomm Incorporated, hereby certify that I have electronically filed the foregoing "Reply in Support of Qualcomm Incorporated's Renewed Motion to Dismiss Plaintiffs' Complaint" with the Clerk of the Court using the ECF system, which sent notification of such filing to the following:

*Attorneys for Plaintiffs*

**Alan W. Perry**
**Daniel J. Mulholland**
**Walter H. Boone**
Forman Perry Watkins Krutz & Tardy, LLP
City Centre, Suite 200
200 South Lamar Street
Jackson, MS 39201

**Charles L. McBride, Jr.**
**M. Patrick McDowell**
**Joseph A. Sclafani**
**Brian C. Kimball**
Brunini Grantham Grower & Hewes, PLLC
The Pinnacle Building, Suite 100
190 East Capitol Street
Jackson, MS 39201

**Walter T. Johnson**
Watkins & Eager, LLC
P.O. Box 650
Jackson, MS 39205

*Attorney for Defendants AT&T, Inc. and AT&T Mobility, LLC*

**Aaron M. Panner**
**Kenneth M. Fetterman**
**Michael K. Kellogg**
**William J. Rinner**
Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC
1615 M Street NW, Suite 400
Washington, D.C. 20036

17

1337600

**David W. Upchurch**
Holland Ray Upchurch and Hillen
P.O. Drawer 409
Tupelo, MS 38802-0409

*Attorneys for Defendant Motorola Solutions, Inc.*

**Chahira Solh**
**John S. Gibson**
**Jason C. Murray**
Crowell & Moring, LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614

**Jim Ming Greenlee**
**James D. Johnson**
Holcomb Dunbar—Oxford
Post Office Box 707
Oxford, MS 38655-0707

This the 24th day of April, 2013.

/s/ L. F. Sams, Jr.
L. F. Sams, Jr.

18

1337600